The trial court will reinstate the decree.

---

## STATE OF NORTH DAKOTA v. GEORGE L. BICKFORD.

### (147 N. W. 407.)

**Evidence of embezzlement — sufficient to justify conviction.**

1. Evidence examined and *held* sufficient to justify a conviction of the crime of embezzlement under §§ 9204, 9205, Rev. Codes 1905.

**Information — counts — one general offense.**

2. Information examined, and *held* to charge one, and not several offenses.

**Embezzlement — general crime — committed in different ways — charged in different counts.**

3. Sec. 9205, Rev. Codes 1905, describes but one general crime of embezzlement, which may be committed in different ways, and the same may be charged in different counts alleging the various ways by which the same was accomplished.

**Unlawful acts — committed in different ways — separate counts.**

4. Where the statute declares an act unlawful when perpetrated in any one or all of several modes, the information may charge the act in separate counts, basing each count upon the different modes specified.

---

Note.—The authorities on the question as to when a bank deposit is special are reviewed in a note in 39 L.R.A.(N.S.) 847.   And on the question as to the care required of a bank in keeping special deposit, see notes in 32 L.R.A. 769; 25 L. ed. U. S. 750; and 9 Am. Dec. 183.

**Felony — evidence of one transaction — rule — different counts — joinder of — evidence — general verdict.**

5. Although it may be the general rule in the case of a felony that the court will permit the prosecution to give evidence of only one felonious transaction, it is also the rule that when it appears on the opening of the case and during the trial that there is no more than one criminal transaction involved, and the joinder of the different counts is meant only to meet the various aspects in which the evidence may present itself, the court will not restrict the prosecuting officer to particular counts, and will suffer a general verdict to be taken on the whole.

**Verdict — form of — effect of — general crime of embezzlement committed by different methods.**

6. A verdict of "guilty of embezzlement as charged in the information" is sufficient in a prosecution for having committed the crime of embezzlement condemned by § 9205, Rev. Codes, 1905, in the different manners described in said section. Such a verdict is a general verdict, and has the same effect as the verdict of "guilty" provided for in § 10044, Rev. Codes, 1905.

**Evidence of peculations — parts of one crime — aggregate shortage proved —information — charging clause.**

7. Where the evidence shows a cumulation of peculations, the aggregate misappropriation may be treated as one crime, and all the peculations as parts of the one offense, and the aggregate shortage proven may be more or less than the sum stated in the information.

**Exact amount embezzled need not be alleged — need not be proved.**

8. It is not necessary that the exact sum embezzled should be alleged, nor is it necessary to prove the exact sum as charged.

**Embezzlement by public officer — turning moneys over to successor — securities — fraudulent conversion — shortage — made good on final settlement — fact of embezzlement not negatived.**

9. The crime of embezzlement by a public officer does not merely consist in failing to turn over all moneys to the state at the time of the relinquishment of his office, but in having fraudulently converted money or securities while in that office. The mere fact, therefore, that a friend may come to one's rescue, and furnish money sufficient to make good a shortage on a final accounting, does not in any way negative the fact that, prior to such final accounting, money has been fraudulently converted,—that is to say, embezzled.

**Special deposit — bailment — specified property — identification and return.**

10. A special deposit is a bailment of certain specified property, which can be and is to be identified and returned.

**Special deposit — banks — money in, for safe keeping — bailee — identical money — mingling with other funds of bank — return of.**

11. A special deposit as used in ¶ 14 of § 111, Rev. Codes 1905, implies the

placing of money in a bank for safekeeping, so that the banker is a bailee, and must keep the identical money without mingling it with the other funds of the bank, to be returned in kind to the state treasurer or such person or persons as he may direct.

**Deposit — special deposit — banks — permission to loan — prohibited — safekeeping and return of same property.**

12. A deposit in a bank is not a special deposit, where the banker is allowed to loan out or to use the money deposited. A special deposit involves safekeeping merely, and the return of the identical money or articles deposited.

**Embezzlement — failure to account for funds — physical confiscation.**

13. The crime of embezzlement may be committed by a fraudulent failure to account for funds, as well as by physical confiscation.

**Proof — order of, on trial — trial court — control of — discretion.**

14. The order of proof upon the trial of a cause is largely within the control of the trial judge, and his discretion must largely control.

**Testimony — general objection — not best evidence — irrelevant, incompetent, and immaterial — proper rebuttal evidence.**

15. The objection that the testimony "is not the best evidence, incompetent as such, irrelevant, and immaterial," does not raise or suggest the objection that such testimony is not proper on rebuttal.

(Additional Syllabus on Rehearing, Filed May 22, 1914.)

**Criminal statute — constitutional objection — raised for first time on petition for rehearing — may be considered.**

16. A constitutional objection to a criminal statute may be raised on a petition for a rehearing, even though it has not been raised either upon the trial or upon the original appeal.

**Conviction — imprisonment — judgment for fine — estate — fine — not merely compensatory to state or municipality.**

17. That part of § 9205, Rev. Codes 1905, which provides that in case of conviction the defendant shall, in addition to serving a term of imprisonment, "pay a fine equal to double the amount of money or other property so embezzled as aforesaid; which fine shall operate as a judgment at law on all the estate of the party so convicted and sentenced, and shall be enforced by execution or other process for the use of the state, county, precinct, district, town, city, or school district whose moneys or securities have been so embezzled," imposes a fine, and did not merely include in said statute a provision for the compensation of the state or municipality injured.

**Fine — judgment for — operate against entire estate — unconstitutional — funds — common schools.**

18. That part of § 9205, Rev. Codes 1905, which provides that the defendant

upon conviction shall "pay a fine equal to double the amount of money or other property so embezzled as aforesaid, which fine shall operate as a judgment at law on all the estate of the party so convicted and sentenced, and shall be enforced by execution or other process for the use of the state, county, precinct, district, town, city, or school district whose moneys or securities have been so embezzled," is unconstitutional in that it violates § 154 of the Constitution of North Dakota, which provides that "the interest and income of this [land grant] fund, together with the net proceeds of all fines for violation of state laws, and all other sums which may be added thereto by law, shall be faithfully used and applied each year for the benefit of the common schools of the state."

**Part of statute unconstitutional — remainder not necessarily void — act — inducement — incident — separate parts — independent — effective standing alone — test.**

19. When a part of a statute is unconstitutional, that fact does not compel the courts to declare the remainder void, unless the unconstitutional part is of such import that the other parts of the statute, if sustained without it, would cause results not contemplated or desired by the legislature. The question to be determined is whether the obnoxious part is an inducement of the whole act, or whether it is merely an incident thereto. The test to be applied in determining whether the unconstitutional provision in a statute invalidates the whole enactment is the answer to the following questions: (1) Are the constitutional and the unconstitutional parts capable of separation so that each may be read and may stand by itself? (2) Is the unconstitutional part so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the legislature if the clause or part is stricken out? (3) Is the insertion of words or terms necessary in order to separate the constitutional part from the unconstitutional part, and to give effect to the former only?

**Elimination of part of act — unconstitutional — legislature— presumption in favor of remainder.**

20. Sec. 9205, Rev. Codes 1905, may be enforced and sustained even after eliminating therefrom the provision which relates to the fine. Even after the excision of such part of the statute, it can be presumed that the legislature would have passed the act, even though it had realized that the unconstitutional part would be eliminated therefrom.

Opinion filed December 2, 1913. Opinion on Rehearing filed May 22, 1914.

Appeal from the District Court of McLean County, *Crawford*, J.

Defendant was convicted of the crime of embezzlement as a public officer, under § 9205, R. C. 1905, and appeals.

Affirmed.

Statement of facts by BRUCE, J.

Defendant was convicted of the crime of embezzlement of state funds and securities, under §§ 9204 and 9205, Rev. Codes 1905, and an appeal has been taken to this court. There is but little conflict between counsel as to the particular acts done or omitted. The controversy is almost entirely over the motives which caused the same to be done or omitted, and the conclusions of fact and of law to be drawn therefrom. According to the state's theory of the case, which at any rate found some support in the evidence: On January 4th, 1909, the defendant took charge of the state treasurer's office. At this time the Bowbells bank was not a state depository, although the defendant's predecessors had evidently deposited $5,000 therein. On January 9th, 1909, the defendant deposited $20,230 of state funds in this bank on open account, and carried it on such open account until February, 1909. The Bowbells bank had a capital of $10,000, with no surplus, the defendant owning forty-eight shares, his wife ten, and his brother forty-two. The bank was not named as a regular state depository until January, 1910, and then only for the sum of $5,000, and during the times mentioned there was in this bank, in addition to the sum hereinafter mentioned, the $5,000 on open account which was made by the defendant's predecessors. In February, 1909, the open-account deposit was transformed into a certificate of deposit for $20,230. In regard to this transaction, the defendant testified: "When we transferred the open account by means of this check for $20,230 into the form of a certificate of deposit, I still had the same amount of money on deposit in the First State Bank of Bowbells as I had before, so far as the state was concerned. The certificate of deposit register showed that I had $5,-000 subject to check and the certificate of deposit. It would not appear upon any books or any report I would have to make, as a deposit in the First State Bank of Bowbells, a mere superficial investigation, unless a person went into the cash drawer and examined the items themselves, they would not know I had $25,000 in the bank belonging to the state." In February, 1909, the county treasurer of Barnes county sent in his report of collections of school funds, and with it sent his official checks on various Valley City banks aggregating $25,-215.26. Between the first of February and the middle of March, 1909,

the defendant sent these checks to the Bowbells bank. They were collected by the bank, and the bank retained the money. The defendant did not take a certificate of deposit, nor did he carry the amount on an open account. He merely took the bank's receipt for the money. On cross-examination he said: "Prior to the 19th day of March I had on deposit of state money in the First State Bank of Bowbells $5,000 in round numbers on open account, $20,230 in this one certificate of deposit, and $25,215.26 represented by the amount sent for the proceeds of the state auditor's draft, a total sum of something over $50,000. The First State Bank of Bowbells was the only bank of which I had personal knowledge, and I still say I felt more secure. . . . This item of $25,215.26 actually went to the bank at Bowbells. I said I had an acknowledgment of its receipt, in the cash drawer in my desk, that was not open to public examination. It was not material to any of the clerks in the office other than myself to know that such a slip was in the office. I knew where it was, and I could account for it." Mrs. Kirtz, the bookkeeper of the First State Bank of Bowbells, testified that she could find no account indicating any special deposit of this kind, and on the same subject the defendant testifies: "I made an effort to have no books down here (at the trial). I was not required to bring them. I knew that the deposit of this $25,215.26 was going to be in question in this trial; and it was on deposit in the First State Bank of Bowbells. I cannot state positively that that ledger would show this identical article; the item would have to show up in the aggregate on the general ledger, not itemized. It depends on how the books were kept whether if it was a special deposit the item would have to show when it came into that special deposit. I know of their bookkeeping system, and if I made a deposit, general or special, of $25,215.26, it would have to be credited to somebody. I do not suppose this was credited to me, it would be credited to an account. I never looked it up. This item of $25,215.26 actually went to the bank at Bowbells." It appears from the statutes and the testimony introduced on the trial, that the system of accounting in vogue in the state auditor's and state treasurer's offices at the times in question was as follows: The respective officers reported collections due to the state to the state auditor from time to time. On receipt of such reports the state auditor made

the distribution of the sums to the various state funds, and entered them on his record, and thereupon drew a draft or warrant upon the county treasurer payable to the state treasurer. This warrant was then delivered to the state treasurer and charged to him on the state auditor's books. The state treasurer then deposited the draft or warrant with a bank for collection and credit to the state. The county treasurer of Barnes county did not conform to this practice. Instead of waiting for the state auditor's draft or warrant and honoring the same, he sent his checks to the state treasurer with his report, without waiting for the draft or warrant to be presented. The result was that for some time the amount due from Barnes county was in the treasurer's hands before the county treasurer became charged with the state auditor's warrant therefor. With respect to Barnes county, therefore, it was the state treasurer's duty to enter the warrant in the usual way on the collection register, and to record the fact of its payment, and thereupon cancel it and send it to the county treasurer. The checks aggregating $25,215.26, hereinbefore mentioned, were sent in by the Barnes county treasurer with his report, and were received by the state auditor in the early part of February, 1909. They were turned over to the · state treasurer by the auditor on March 15th, 1909. The checks were paid by the bank on which they were drawn on the 19th day of March, 1909. The state auditor's warrant therefor, however, was not made out until May, 1909. The state treasurer, instead of canceling the state auditor's warrant, and sending it to the county treasurer, and entering such warrant on the collection register in the usual way, and of recording the fact of its payment on his books, put the warrant in the cash drawer. An examination of the state treasurer's office was made by the deputy bank examiner some time between the 10th and the 15th of August, 1909. A few days before, and on August 7th, 1909, this paid warrant for $25,215.26 was entered on the remittance register, with three other similar paid warrants and other items aggregating $77,962.73, and remitted by the treasurer to the First National Bank of Fargo, and at the same time the account of that bank was charged with a deposit of that amount. On August 12, 1909, the auditor's warrant for $25,215.26 was charged back to the state by the First National Bank of Fargo, as the bank did not care to carry it, and communi-

cated by telephone with the defendant in regard to the matter. The bank, however, before returning it, was requested to hold it three days. The amount was credited back to the bank in the state treasurer's books under date of August 16, 1909, but did not appear as a cash item again until August 18, 1909. It was then kept as a cash item for about a week, and then again entered upon the remittance register, with other items, as a remittance to the First National Bank of Fargo, and charged to the account of that bank. It was not, in fact, however, remitted, and this fictitious debit was offset by crediting to that bank an equivalent sum on September 30, 1909. In this connection it should be stated that under chapter 217 of the Laws of 1909, the state treasurer was required to file with the governor and publish quarterly a statement showing the deposit of state funds, and September 30th, 1909, was the last day of the quarter. This same paid warrant again appeared as a cash item from September 30th, 1909, until January, 1910, when it was again put on the remittance register as a remittance to the First National Bank of Fargo, and charged as a deposit to the account of that bank. It was not in fact, however, remitted to the bank. It is to be noticed in this connection that there was to be, and was, another examination by the state auditing board, or the state bank examiner, of the treasurer's office on or about January 8th, 1910. The result of this entry was to make it appear on the treasurer's books that there was $25,215 26 more on deposit in the First National Bank of Fargo than there actually was. Another quarterly report was due at the end of March, 1910, and on March 21st, 1910, a check was drawn by the state treasurer on the First National Bank of Fargo, and made payable to the Citizens State Bank of Flaxton for $1,900, and charged to that bank. The check, however, was not sent on or used, but was placed among the canceled vouchers in the state treasurer's office. On March 28th, 1910, another state treasurer's check for $23,315.26 was drawn on and credited to the account of the First National Bank of Fargo, and made payable to the Union National Bank at Grand Forks, and charged to it. This check was not, however, used or sent out of the state treasurer's office, but was also retained and placed with the canceled vouchers, although the result of the issuance of both checks made it appear that the pretended deposit of $25,215.26 in the First National Bank of

Fargo had been transferred to the Citizens State Bank of Flaxton and the Union National Bank of Grand Forks. In this manner the account of the First National Bank at Fargo was reduced on the state treasurer's books to conform to the actual balance, but it made the state treasurer's books show $1,900 more in the Flaxton bank and $23,315.26 more in the Grand Forks bank than the balances actually were. To remedy this discrepancy, the defendant in a letter to Mr. Burgett, president of the Flaxton bank, sent for redemption to such bank a certificate of deposit for $5,000, of which $1,900 was to be credited by the bank to the state, and a draft issued to the defendant for $3,100, the balance of the $5,000, and a separate draft to the defendant for $54.65 for the accrued interest. This separate draft for $54.65 was never credited to the state, nor was the deposit of $1,900 charged to the Flaxton bank on the state's books. In order to remedy the discrepancy in the account of the Union National Bank, a deposit for $23,315.26 was made on March 28th, 1910. This deposit was composed of the certificate of deposit of the Bowbells bank for $20,000 dated October 11th, 1909, a draft of $3,100 from the Flaxton bank, and $215.26 in some form from the Bowbells bank, making $23,315.26 in all. For these items defendant obtained a draft from the Bowbells bank for the amount of $23,315.26, which he sent to the Grand Forks bank. The effect of this was that it repaid $20,215.26 of the previous misappropriations, the $1,900 and $3,100 of state funds derived from the Flaxton certificate being, however, merely transferred from one bank to another, and the $54.65 interest item being unaccounted for.

In addition to all of this there was also received from Barnes county in March and April, 1909, $15,220.55 for February school fund collections, $16,569.87 for ordinary February collections, and $11,646.14 for ordinary March collections. These amounts were, as before, sent by means of checks on Valley City banks. The checks were sent to the Bowbells bank, and certificates of deposit were taken for the two last items, and a draft on a Minneapolis bank for the first item of $15,220.15. The certificates of deposit and draft were, as in the case of the former transactions, kept in the defendant's private desk, and when the state auditor's drafts were delivered to him for the respective amounts he kept them uncanceled, and put them in the state treasurer's

drawer as cash items, the same as the $25,315.26 transaction hereinbefore referred to. Just before the August, 1909, examination by the state bank examiner, these three state auditor's drafts were entered on the remittance register as part of a $77,962.73 remittance to the First National Bank of Fargo, in which remittance, as heretofore shown, the $25,315.26 drafts were also attempted to be concealed. This remittance was charged to the account of the Fargo bank. The drafts, as a matter of fact, were never sent to the Fargo bank. Evidently, however, other drafts or funds were sent, among them a certificate of deposit for $4,000 on the bank at Flaxton, which was afterwards recalled. It thus appears that during the first three months of the defendant's term of office about $90,000 was turned into the Bowbells bank, a part being in the form of a draft of the bank on a Minneapolis correspondent for the sum of $15,220.55, which was held by the defendant in his private desk until August, 1909, when it was apparently sent to the First National Bank at Fargo as part of a $77,962.73 remittance, with other substituted items, including the $4,000 certificate of deposit of the Flaxton bank afterwards recalled, but which did not include any of the state auditor's drafts hereinbefore referred to. Up to this date, therefore, the misappropriations represented by the two Bowbells bank certificates of deposit for $16,569.87 and $11,646.14 were ostensibly made good, less the sum of $4,000 represented by the Flaxton certificate of deposit, which was recalled; this leaving unpaid the auditor's draft for $25,215.26, an open account in the Bowbells bank of $20,230, and a balance of $4,000 on two certificates of deposit for $16,569.87 and $11,646.14,—in all $49,445.26. So that, in addition to the draft of $15,220.55, which was then paid after being held several months, approximately $25,000 of the misappropriated items were apparently repaid by means of substituted items in the remittance to Fargo on August 7, 1909.

Previous to this, however, a deposit of $25,000 from the Waseca Hail Insurance Company, safety fund, was taken by the defendant and placed in the Bowbells bank, without any entry thereof being made upon his books. So that the amount of misappropriation remaining in the Bowbells bank on and after August 7, 1909, was substantially the same as before, and over $60,000. On August 17, 1909, money of the

state was again taken to replace this insurance money. The facts in regard to the insurance deposit are as follows: In May, 1909, the insurance company deposited $25,000 in bank certificates of deposit as a safety fund. This was a mere temporary deposit pending an arrangement for a deposit of bonds. The defendant turned these certificates over to the Bowbells bank shortly after receiving them, and the bank cashed them and kept the money. In the latter part of July or the first of August, 1909, the insurance company desired to substitute government bonds for the cash, and to that end drew a draft on the state treasurer, with the bonds attached, and to be delivered on payment of the draft. The defendant delayed the matter until August 17th, when he honored the draft by drawing checks on numerous state depositories to the amount of $25,000. He then covered up the misappropriation to the Bowbells bank by putting these government bonds in the cash drawer, and counting them as cash items, and keeping up the device until he substituted Bowbells certificates of deposit just before going out of office. There can be no question that the insurance deposit had been misappropriated, that state funds were drawn upon to make good this shortage, that the government bonds were put in the cash drawer to cover up this shortage, and that finally Bowbells certificates were put in to replace the government bonds. As hereinbefore shown, the state auditor's draft for $25,215.26 was retired by means of false entries indicating a transfer of $23,315.26 from the First National Bank of Fargo to the Union National Bank of Grand Forks, and $1,900 from the Fargo bank to the Flaxton bank. In this transaction, also, a certificate of deposit of $5,000 from the Flaxton bank, which represented state money, was used to make good a part of the $25,215.26, and $20,000 was obtained by the Bowbells bank giving a draft in payment of the $20,230 before referred to, and which was originally deposited on open account, and subsequently changed into a certificate of deposit. The remaining $215.26 was taken from the remaining so-called special deposit in the Bowbells bank. This transaction took place at the end of March, 1910. On April 6, 1910, the defendant received another remittance of $15,438.11 from the Barnes county treasurer by means of checks on the Valley City banks as before. These, as before, were sent to the Bowbells bank, and certificates of deposit.

taken therefor. When the state auditor's draft for the amount was received, he, as before, carried that draft as a cash item in the same way he had previously carried the other paid drafts. It was also taken out, and ostensibly remitted to Fargo, and then put back again in the drawer as before. This continued until the end of his term, when Bowbells certificates were deposited for the whole shortage, except the $54.65 before referred to. The final result, as shown by the evidence, was that during the defendant's term of office there was a total embezzlement of at least $60,492.76, $60,438.11 on the final showing being represented by Bowbells certificates of deposit, and $54.65 being unaccounted for. The defendant's successor in office, Gunder Olson, qualified and took charge of the office on January 3, 1911. At this time there were in the cash drawer the certificates of deposit from the Bowbells bank for $60,-438.11, none of which had ever been disclosed to the state bank examiners or in the treasurer's reports to the governor. The defendant sought to induce Mr. Olson to accept these certificates as the equivalent of cash, and to hold them about thirty days, stating that the Bowbells bank was then unable to pay them, and that he would within thirty days be able to take them up as the result of a deal then on hand. This the incoming treasurer declined to do, and the defendant was arrested. Shortly after his arrest his friends and associates made good the shortage to the amount of $60,428.11, and the certificates were turned over to them. It, however, appears that on the final settlement there was, in addition to the certificates of deposit, $150 in cash, which, if the certificates of deposit had been accepted, would have amounted to more than was necessary to account for the money which was required to be transferred to the defendant's successor. The defendant, however, took this money out of the cash drawer, and stated that he would return it if any deficiency was found.

The defendant, on the other hand, takes the position that the deposit in the Bowbells bank was a special deposit for safe keeping merely, and was put there because the defendant had confidence in the institution. He also claims that the irregularity in the accounts were either due to poor bookkeeping or to the exigencies arising from the overloaded depositories and the necessity of collecting the Barnes county checks when received. His version of the affair is that when the ac-

counts were turned over to him the First National Bank of Bismarck was qualified as a depository for $60,000, and had actually on deposit more than double that amount; that the deposits in the other Bismarck banks exceeded the amount for which they were designated, and that the same was true of many others; that at certain times an excess deposit was a practical necessity, for sometimes a single remittance is far in excess of the amount for which a deposit is designated, or can under the law be qualified for; that at about the time the defendant qualified two bank failures had taken place; that the total number of depositories designated by the state was 503, and their total capacity was about $2,100,000; that during the year 1909 the state had on hand in money necessary to be deposited at one time as high as $2,348,881.59, or approximately $250,000 more than the limits of the depositories; that for practical purposes the limit was less than $2,100,000, as all of the accounts were active, and collections had to be made through the banks in various counties; that on May 18th, the date of the receipt of the draft for $25,215.26, the amount of actual money in the hands of the treasurer required to be distributed among these depositories was $2,223,315.82, or more than $123,000 in excess of the legal limits of the depositories; that on July 1st the cash on hand aggregated $2,348,881; that when the defendant assumed office the statute in regard to the legal limit of the depositories was not recognized, nor were the methods of collection prescribed by law strictly followed; that the defendant was young and inexperienced, and had never held an office of a similar kind before, and was surrounded by clerks, some of whom were inexperienced and possibly careless; that at the very threshold of his duties he was confronted with a crisis, and that there were turned over to him three depositories (the Bismarck banks) which were already overloaded, and that there were $20,230 in checks and drafts to be taken care of; that when in February, 1909, the Barnes county checks for $25,215.26 were sent to him there was a letter of transmittal, which was handed by him to the auditor, and the letter was indorsed by the auditor "3-15-09. Draft turned over to the state treasurer, cancel draft when sent to state treasurer;" that the draft, however, was sent out by the state auditor's office uncanceled or bearing no notation to show the true condition, and that the same is true of the other drafts

for similar remittances; that on March 15th, 1909, the state auditor told the defendant "to get rid of those checks because they were for $25,000, and I didn't want them laying around the vault. I do not remember who he gave them to. There had been a bank failure just a few months before in which the state had lost some funds; I was not anxious to hold those checks because I had to wait from the land department to give me the distribution of the funds." The deputy state auditor also testified "that (the draft) carries the first information to the state treasurer's office of the amount of taxes due from such and such a county. Up to the time of the receipt of the draft, the state treasurer has no information as to the distribution upon his books of the moneys to the different funds. . . . Until he receives this, he has no method by which he can go through his register and enter the amounts to correspond with our register; he cannot get the entries into his books until this draft is received." The defendant, in short, claimed that the money was irregularly in his hands; that the checks had to be collected; that if they had been placed in a regular depository account they would have created a discrepancy between his books and the books of the state auditor; and he knew the Bowbells bank, and felt confident and secure with it. He further claimed that he was confronted with another crisis when, sixty-one days later, the draft came; and that on that day the cash on hand aggregated $100,000 in excess of the legal capacity of the depositories, and from $200,000 to $500,000 in excess of their practical limit. It was for him to determine, he says, whether the money should be withdrawn from what he calls a special deposit for safe keeping in the Bowbells bank, and placed in the already gorged depositories, or should it be permitted to remain where it was. It is claimed that he is not on trial charged as a poor bookkeeper, or as keeping unskilled or incompetent assistants. It is claimed that the errors committed when the draft was taken from the drawer once or twice and sent out in the regular channels were the errors of his assistants, and that such errors were not uncommon or unnatural, and had before been made. He says that in September or October, and as soon as the depositories could receive the money, the special deposit was withdrawn, save $215.26, which was overlooked, but was afterwards withdrawn. As far as the subsequent checks for $15,225.55 from Barnes county are

28 N. D.—4.

concerned, he claims that the same were turned over to him by the auditor, and cashed on March 26, 1909; that the checks were sent to the Bowbells bank, which issued its draft therefor on the Northwestern National Bank of Minneapolis on March 24, 1909; that when these checks were received the depositories were glutted, and he held the Bowbells draft in a drawer in his desk until it could be deposited, and on August 10th, 1909, less than three months after the date of the state auditor's draft, the Bowbells bank draft was cashed. In relation to the Barnes county checks for $16,569.87, he claims that they were given to him by the auditor; that they were forwarded by him to the Bowbells bank for collection, and that the Bowbells bank gave him a draft on the Northwestern National Bank of Minneapolis on April 3d, 1909, for the same; that at this time the depositories were gorged, and that the draft was held by him until August 10th, and then cashed. In regard to the Barnes county checks for $11,646.11, he claims that on account of the fact that the school fund collections were also included, a complete distribution could not be made until the drafts were issued by the auditor; that the checks were sent by him to the Bowbells bank as before, and a draft on Minneapolis obtained; that the draft was held until August 7, 1909, for the same reasons as before. As far as the remittance of $15,438.11 is concerned, he says that the same transaction occurred, but, instead of a draft being taken, a certificate of deposit on the Bowbells bank was taken and was held by him until the end of his term. In regard to the Waseca Insurance Company deposit, it is claimed that the money did not belong to the state at all; that it was deposited by the defendant in the Bowbells bank, and remained there as a special deposit until transformed into a certificate of deposit in December, 1910; that in the summer of 1910, the insurance company desired to substitute bonds for this money, and this was accomplished by drawing checks on the various depositories to pay a draft made by the company; that the special deposit was then transferred to the state, and the bonds placed in the cash drawer to represent the same; that these bonds were· the symbol by which was represented the special deposit. It is claimed that the transaction would not have been open to criticism if the defendant had withdrawn the money from the depositories in August, 1910, and sent the same to the Bowbells bank as a special deposit; but that

this was a laborious and expensive method. Defendant's explanation of the Flaxton bank matter was as follows: The First National Bank of Fargo, through error, had been debited $25,215.00, and it was necessary to correct this error; that the Union National Bank of Grand Forks was entitled to a deposit, and its amount was fixed by the treasurer at $23,215.26; that the Flaxton bank held a certificate of deposit for $5,000; that there was $215.26 remaining in the special deposit in the Bowbells bank; that there was $20,000 worth of certificates of deposit in the Bowbells bank; that the question was to get this adjusted with the least bookkeeping; and that his assistant, Mr. Austin, thereupon credited the Fargo bank with $25,215.26 by drawing checks therefor; that the $5,000 Flaxton certificate of deposit was cashed, leaving $1,900 in open account, and taking a draft for $3,100; that the Flaxton $3,100 draft, with the $215.26 special deposit, and the $20,000 certificate of deposit in the Bowbells bank, were then remitted to the Union National Bank.

*Niles & Koffel,* and *Geo. R. Robins,* and *Geo. A. Bangs,* for appellant.

The information was too broad, vague, and indefinite. The crime of embezzlement may be committed in four different ways. State v. Howe, 27 Or. 138, 44 Pac. 672.

Where the offense may be alternately charged in separate counts, it must clearly appear from such counts that the same offense or transaction is so thus charged. The information or indictment must charge but one offense. Rev. Codes 1905, § 9851; State v. Smith, 2 N. D. 515, 52 N. W. 320; State v. Marcks, 3 N. D. 532, 58 N. W. 25; State v. Belyea, 9 N. D. 353, 83 N. W. 1; State v. Valentine, 7 S. D. 98, 63 N. W. 541; State v. Boughner, 7 S. D. 103, 63 N. W. 542; State v. Hall, 14 S. D. 161, 84 N. W. 766; State v. Mattison, 13 N. D. 391, 100 N. W. 1091.

The rule is that where the information attempts to charge the same offense as having been committed by different means, and separate counts are made use of in so doing, the information must clearly show but one offense charged. People v. Thompson, 28 Cal. 217; People v. Shotwell, 27 Cal. 394, 400; People v. Garcia, 58 Cal. 103; People v.

Quvise, 56 Cal. 396; Territory v. Poulier, 8 Mont. 146, 19 Pac. 594; Sturgis v. State, 2 Okla. Crim. Rep. 373, 102 Pac. 57; DeGraff v. State, 2 Okla. Crim. Rep. 519, 103 Pac. 538; Chanpett v. State, 4 Okla. Crim. Rep. 23, 109 Pac. 124; Scott v. State, 4 Okla. Crim. Rep. 70, 109 Pac. 240; Cochran v. State, 4 Okla. Crim. Rep. 379, 111 Pac. 974; Grant v. State, 6 Okla. Crim. Rep. 372, 117 Pac. 1100; Kimbrell ·v. State, 7 Okla. Crim. Rep. 354, 123 Pac. 1027; State v. Chapman, 6 Nev. 320; State v. Malim, 14 Nev. 288.

The verdict must respond to and be within the issues as framed by the information and the plea of defendant. Rev. Codes 1905, §§ 9914, 10044 and 10059; 12 Cyc. 690; 7 Enc. Pl. & Pr. 459; 22 Enc. Pl. & Pr. 873; 2 Bishop, New Crim. Proc. 2d ed. 1005; Clark, Crim. Proc. 485.

Conviction for some offense duly charged, but less than that alleged, cannot be treated as void; it is a conviction in part. Riflemaker v. State, 25 Ohio St. 395; State v. White, 41 Iowa, 316, 20 Am. Rep. 602; State v. Behee, 17 Kan. 402; State v. Whitaker, 89 N. C. 472; Gibbs v. State, 34 Tex. 135; People v. Coch, 53 Cal. 627; People v. Ah Gow, 53 Cal. 627; Huffman v. State, 89 Ala. 33, 8 So. 28; People v. Curtis, 76 Cal. 57, 17 Pac. 941; State v. Bellard, 50 La. Ann. 594, 69 Am. St. Rep. 461, 23 So. 504; State v. French, 50 La. Ann. 461, 23 So. 606; Chambers v. State, 44 Tex. Crim. Rep. 61, 68 S. W. 286; State v. Copenhaver, 35 Mont. 342, 89 Pac. 61; People v. Smith, 136 Cal. 207, 68 Pac. 702, 13 Am. Crim. Rep. 719; People v. Arnett, 126 Cal. 680, 59 Pac. 204; Kimball v. Territory, 13 Ariz. 310, 115 Pac. 70; People v. Tilley, 135 Cal. 61, 67 Pac. 42; State v. DeWitt, 186 Mo. 61, 84 S. W. 956; People v. Cummings, 117 Cal. 499, 49 Pac. 576; People v. Small, 1 Cal. App. 320, 82 Pac. 87; State v. Pollock, 105 Mo. App. 278, 79 S. W. 980; Koch v. State, 126 Wis. 470, 3 L.R.A.(N.S.) 1086, 106 N. W. 531, 5 Ann. Cas. 389.

Under the law mentioned, one cannot be convicted unless he is an officer or person charged by law with the collection of public moneys. Moore v. State, 53 Neb. 831, 74 N. W. 319; State v. Meyers, 56 Ohio St. 340, 47 N. E. 138; State v. Spaulding, 102 Iowa, 639, 72 N. W. 288; United States v. Smith, 124 U. S. 525, 31 L. ed. 534, 8 Sup. Ct. Rep. 595; United States v. Germaine, 99 U. S. 508, 25 L. ed. 482;

United States v. Bixby, 10 Biss. 238, 6 Fed. 375; State v. Newton, 26 Ohio St. 265; Hartnett v. State, 56 Tex. Crim. Rep. 281, 23 L.R.A.(N.S.) 761, 133 Am. St. Rep. 971, 119 S. W. 855; Com. v. Alexander, 129 Ky. 429, 112 S. W. 586; State v. Bolin, 110 Mo. 209, 19 S. W. 650; Dickey v. State, — Tex. Crim. Rep. —, 144 S. W. 271.

The money in such cases must be public money. United States v. Mason, 218 U. S. 517, 54 L. ed. 1133, 31 Sup. Ct. Rep. 28; State v. Pierson, 83 Ohio St. 241, 93 N. E. 977; State v. Connelly, 104 N. C. 794, 10 S. E. 469; Dickey v. State, — Tex. Crim. Rep. —, 144 S. W. 271.

The ownership of the property embezzled must be alleged in the information and proved on the trial. State v. Collins, 4 N. D. 433, 61 N. W. 467; State v. Nelson, 79 Minn. 373, 82 N. W. 674.

Finding the defendant guilty of embezzlement as charged in the information is material. But the jury failed to find the other essential elements of the offense. The verdict must respond to the issues submitted to the jury. Turley v. People, 188 Ill. 628, 59 N. E. 506; Donovan v. People, 215 Ill. 520, 74 N. E. 772; Mai v. People, 224 Ill. 414, 79 N. E. 633; People v. Lee, 237 Ill. 272, 86 N. E. 573; People v. Davidson, 240 Ill. 191, 88 N. E. 565; People v. Morton, 245 Ill. 530, 92 N. E. 318; State v. Holland, 162 Mo. App. 678, 145 S. W. 522; State v. Grossman, 214 Mo. 233, 113 S. W. 1074; Kimball v. Territory, 13 Ariz. 310, 115 Pac. 70.

The verdict is inadequate and uncertain, as it does not show on which of one or more independent counts the defendant is convicted; and it will not sustain a judgment. State v. Harmon, 106 Mo. 635, 18 S. W. 128; State v. Pierce, 136 Mo. 34, 37 S. W. 815; Scott v. State, 4 Okla. Crim. Rep. 70, 109 Pac. 240.

The court's instruction to the effect that, "it is sufficient to establish that the defendant converted any portion of said sum to his own use as above set forth" is erroneous in that each separate, isolated, distinct transaction, if criminal, constitutes a completed offense. State v. Laechelt, 18 N. D. 88, 118 N. W. 240.

It is incumbent upon the state to elect which offense it will rely upon for conviction. State v. Poull, 14 N. D. 557, 105 N. W. 717.

And this should be required before the defendant shall be compelled to enter upon his defense. People v. Hatch, 13 Cal. App. 521, 109 Pac. 1097; Edelhoff v. State, 5 Wyo. 19, 36 Pac. 627, 9 Am. Crim. Rep. 256; Goodhue v. People, 94 Ill. 37; West v. People, 137 Ill. 189, 27 N. E. 34, 34 N. E. 254; Mayo v. State, 30 Ala. 32; People v. Castro, 133 Cal. 11, 65 Pac. 13; People v. Williams, 133 Cal. 165, 65 Pac. 323; Trask v. People, 35 Colo. 83, 83 Pac. 1010; White v. People, 8 Colo. App. 289, 45 Pac. 539; Stockwell v. State, 27 Ohio St. 563; Bainbridge v. State, 30 Ohio St. 264.

In cases of this character, where the prosecuting officer is at liberty to prove one out of several specific and independent offenses, it is his duty, at or before the commencement of the trial, to elect and settle upon one. People v. Bartnett, 15 Cal. App. 89, 113 Pac. 879; State v. Norris, 122 Iowa, 154, 97 N. W. 999; People v. Seaman, 107 Mich. 348, 61 Am. St. Rep. 326, 65 N. W. 203; Kittrell v. State, 89 Miss. 666, 42 So. 609; Thweatt v. State, 49 Tex. Crim. Rep. 617, 95 S. W. 517; Gelber v. State, 56 Tex. Crim. Rep. 460, 120 S. W. 863; State v. Workman, 66 Wash. 292, 119 Pac. 751; State v. Osborne, 39 Wash. 548, 81 Pac. 1096; State v. Palmberg, 199 Mo. 233, 116 Am. St. Rep. 476, 97 S. W. 566.

When the prosecution fails to so elect, it will be deemed and presumed that it will rely upon the transaction it first isolates, and upon which proof is offered. State v. Hilberg, 22 Utah, 27, 61 Pac. 215; State v. Hansen, 40 Utah, 418, 122 Pac. 375; People v. Williams, 133 Cal. 165, 65 Pac. 323; People v. Clark, 33 Mich. 112, 1 Am. Crim. Rep. 660; Richardson v. State, 63 Ind. 192, 3 Am. Crim. Rep. 302; Wickard v. State, 109 Ala. 45, 19 So. 491; Scruggs v. State, 111 Ala. 60, 20 So. 642; Baker v. People, 105 Ill. 452; State v. Bates, 10 Conn. 372; Mitchell v. People, 24 Colo. 532, 52 Pac. 671; Cochran v. State, 30 Ala. 542; Fields v. Territory, 1 Wyo. 78, 3 Am. Crim. Rep. 318.

Evidence of the commission of other offenses is limited in its purpose, to show intent, motive, or credibility, but never is proof of the specific charge in the information. State v. Laechelt, 18 N. D. 88, 118 N. W. 240; Blashfield, Instructions to Juries, § 354; 11 Enc. Pl. & Pr. 369; 12 Cyc. 631; 7 Enc. Ev. 642; 3 Enc. Ev. 188, 189; 11

Ann. Cas. 818; Harrold v. Territory, 18 Okla. 395, 10 L.R.A.(N.S.) 604, 89 Pac. 202; Bacon v. State Tax Comrs. 60 L.R.A. 350 note; Com. v. Shepard, 1 Allen, 581; Com. v. Sawtelle, 141 Mass. 140, 5 N. E. 312; State v. Lewis, 19 Or. 478, 24 Pac. 914; Chamberlain v. State, 80 Neb. 812, 115 N. W. 555; Stanley v. State, 88 Ala. 154, 7 So. 273; McGuire v. State, 2 Ala. App. 218, 57 So. 57; People v. Gray, 66 Cal. 271, 5 Pac. 240; People v. Glass, 158 Cal. 650, 112 Pac. 295; People v. Cook, 148 Cal. 334, 83 Pac. 49; Edelhoff v. State, 5 Wyo. 19, 36 Pac. 627, 9 Am. Crim. Rep. 256; Herren v. People, 28 Colo. 23, 62 Pac. 833; Warford v. People, 43 Colo. 107, 96 Pac. 556; Jaynes v. People, 44 Colo. 535, 99 Pac. 328, 16 Ann. Cas. 787; State v. Jeffries, 117 N. C. 727, 23 S. E. 163; State v. Beard, 124 N. C. 811, 32 S. E. 804; State v. Greene, 33 Utah, 497, 94 Pac. 987; Kollock v. State, 88 Wis. 663, 60 N. W. 817; Eacock v. State, 169 Ind. 488, 82 N. E. 1039; Porter v. State, 173 Ind. 694, 91 N. E. 340; Storms v. State, 81 Ark. 25, 98 S. W. 678; People v. Hagenow, 236 Ill. 514, 86 N. E. 370; Morse v. Com. 129 Ky. 294, 111 S. W. 714; Francis v. State, 7 Tex. App. 501; McCall v. State, 14 Tex. App. 353; Barton v. State, 28 Tex. App. 484, 13 S. W. 783; Warren v. State, 33 Tex. Crim. Rep. 502, 26 S. W. 1082; Oliver v. State, 33 Tex. Crim. Rep. 541, 28 S. W. 202; Thornley v. State, 36 Tex. Crim. Rep. 125, 61 Am. St. Rep. 837, 34 S. W. 264, 35 S. W. 981; Martin v. State, 36 Tex. Crim. Rep. 125, 35 S. W. 976; Grant v. State, 44 Tex. Crim. Rep. 311, 70 S. W. 954; Peterson v. State, — Tex. Crim. Rep. —, 70 S. W. 978; Scoville v. State, — Tex. Crim. Rep. —, 77 S. W. 792; Wyatt v. State, 55 Tex. Crim. Rep. 73, 114 S. W. 812; Harris v. State, 55 Tex. Crim. Rep. 469, 117 S. W. 839; Field v. State, 55 Tex. Crim. Rep. 524, 117 S. W. 806; Harvey v. State, 57 Tex. Crim. Rep. 5, 136 Am. St. Rep. 971, 121 S. W. 501; Stanley v. State, 62 Tex. Crim. Rep. 306, 137 S. W. 703; Adams v. State, 62 Tex. Crim. Rep. 426, 138 S. W. 117; Carden v. State, 62 Tex. Crim. Rep. 545, 138 S. W. 598; Thomas v. State, 63 Tex. Crim. Rep. 98, 138 S. W. 1018; Saldiver v. State, 55 Tex. Crim. Rep. 177, 115 S. W. 584, 16 Ann. Cas. 669.

And a failure to object or except will not cure error in such respect. 3 Enc. Ev. 189; 11 Am. & Eng. Enc. Pl. & Pr. 370, note, 1; Blash-

field, Instructions to Juries, 354; Porter v. State, 173 Ind. 702; 91 N. E. 349; Warren v. State, 33 Tex. Crim. Rep. 502, 26 S. W. 1082; Thornley v. State, 36 Tex. Crim. Rep. 125, 35 S. W. 981; Martin v. State, 36 Tex. Crim. Rep. 125, 35 S. W. 976; Stanley v. State, 62 Tex. Crim. Rep. 306, 137 S. W. 703; Carden v. State, 62 Tex. Crim. Rep. 545, 138 S. W. 598; Thomas v. State, 63 Tex. Crim. Rep. 98, 138 S. W. 1018.

There was error in the court's denial of defendant's motion to require the state to elect upon which count it would proceed to trial. Rev. Codes 1905, § 9205; State v. Howe, 27 Or. 138, 44 Pac. 672; State v. Reinhart, 26 Or. 466, 38 Pac. 822; Edelhoff v. State, 5 Wyo. 19, 36 Pac. 627, 9 Am. Crim. Rep. 256; State v. Poull, 14 N. D. 557, 105 N. W. 717.

The belief of right on the part of the defendant negatives the possibility of embezzlement; and the court erred in refusing such instruction. Rev. Codes 1905, § 9213; 10 Am. & Eng. Enc. Law, 2d ed. 996, 997; State v. Lanyon, 83 Conn. 449, 76 Atl. 1095; Eatman v. State, 48 Fla. 21, 37 So. 576; State v. Culver, 5 Neb. (Unof.) 238, 97 N. W. 1015; Wadley v. Com. 98 Va. 803, 35 S. E. 452; State v. Wallick, 87 Iowa, 369, 54 N. W. 246; People ex rel. Perkins v. Moss, 187 N. Y. 410, 11 L.R.A.(N.S.) 528, 80 N. E. 383, 10 Ann. Cas. 309; McCourt v. State, 64 N. Y. 583; People v. Hurst, 62 Mich. 276, 28 N. W. 838; People v. Bauman, 105 Mich. 543, 63 N. W. 516.

The defendant had the legal right to deposit state moneys in any bank deemed by him suitable; and, upon request, it was error for the court to refuse to so charge. Iowa Code 1897, § 4840; Okla. §§ 2304 and 5692; Mills's Anno. Stat. (Colo.) § 1249; Hill's Anno. Laws (Or.) § 1772.

A general deposit of money does not constitute a loan, or a conversion thereof. 13 Cyc. 790, note 55; 1 Bolles, Banking, 430; Allibone v. Ames, 9 S. D. 74, 33 L.R.A. 585, 68 N. W. 165; Moulton v. McLean, 5 Colo. App. 454, 39 Pac. 78; Davis v. Dunlevy, 11 Colo. App. 344, 53 Pac. 250, 27 Colo. 244, 60 Pac. 570; Warren v. Nix, 97 Ark. 374, 135 S. W. 896; Law's Estate, 144 Pa. 499, 14 L.R.A. 103, 22 Atl. 831; Hunt v. Hopley, 120 Iowa, 695, 95 N. W. 205; State ex rel. Carroll v. Corning State Sav. Bank, 136 Iowa, 79, 113 N. W. 500;

State v. McFetridge, 84 Wis. 473, 20 L.R.A. 223, 54 N. W. 1, 998; State v. Hill, 47 Neb. 456, 66 N. W. 557; Farmers & M. Bkg. Co. v. Red Cloud, 62 Neb. 442, 87 N. W. 175; Bardsley v. Sternberg, 18 Wash. 612, 52 Pac. 251, 524; Thompson v. Territory, 10 Okla. 409, 62 Pac. 355; Baker v. Williams & E. Bkg. Co. 42 Or. 213, 70 Pac. 711; Comstolk v. Gage, 91 Ill. 338.

The defendant was not responsible for the acts or omissions of the Bowbells bank, or of any of its officers, unless authorized, directed, or commanded by him; and, upon request, the court's refusal to so charge was error. State v. Carmean, 126 Iowa, 291, 106 Am. St. Rep. 352, 102 N. W. 97; Ex parte Rickey, 31 Nev. 82, 135 Am. St. Rep. 651, 100 Pac. 134; Ex parte Smith, 33 Nev. 466, 111 Pac. 930; Eureka County Bank Habeas Corpus Cases, 35 Nev. 80, 126 Pac. 655, 129 Pac. 308.

It was error to instruct the jury that the ownership of the moneys was not included in the material allegations of the information. State v. Collins, 4 N. D. 433, 61 N. W. 467; State v. Young, 9 N. D. 169, 82 N. W. 420.

*Andrew Miller,* Attorney General, and *H. R. Berndt,* State's Attorney, for respondent (*Engerud, Holt & Frame,* of counsel).

There is a radical difference between the transaction itself and the form or forms of committing or doing it. Rev. Codes, 1905, § 9851; People v. Shotwell, 27 Cal. 394; People v. Thompson, 28 Cal. 214; People v. Quvise, 56 Cal. 396.

The law requires that the identity of the offense charged be clear, and not left to inference. People v. Thompson, 28 Cal. 214; People v. Jailles, 146 Cal. 301, 79 Pac. 965; People v. Shotwell, 27 Cal. 394; People v. Garcia, 58 Cal. 103; People v. Quvise, 56 Cal. 396; Territory v. Poulier, 8 Mont. 146, 19 Pac. 594.

Where different courts in an information refer to the same transaction, the pleading is good, even though the counts set forth the different ways in which the offense was committed. Taylor v. People, 12 Hun, 212; People v. Rose, 52 Hun, 33, 4 N. Y. Supp. 787; People v. Rice, 35 N. Y. S. R. 185, 13 N. Y. Supp. 161; People v. Rose, 39 N. Y. S. R. 291, 15 N. Y. Supp. 815; People v. Callahan, 29 Hun, 580; People v. Crotty, 30 N. Y. S. R. 44, 9 N. Y. Supp.

937; People v. Dimick, 107 N. Y. 13, 14 N. E. 178; People v. Charbineau, 115 N. Y. 433, 22 N. E. 271; Candy v. State, 8 Neb. 482, 1 N. W. 454; State v. Nelson, 29 Me. 329; State v. McNally, 55 Md. 559; Bishop, Crim. Proc. 2d ed. 457; M'Gregg v. State, 4 Blackf. 101; Cooper v. State, 79 Ind. 206; McCollough v. State, 132 Ind. 427, 31 N. E. 1116; Kane v. People, 8 Wend. 203; Mayo v. State, 30 Ala. 32; Cummins v. People, 4 Colo. App. 71, 34 Pac. 734.

There is no question but that the offense charged must be clearly stated, to the end that it may be identified and plain to defendant, and that the verdict must respond to the offense charged. Both these requirements are met in this case. State v. French, 50 La. Ann. 461, 23 So. 606; State v. Jenkins, 60 Wis. 599, 19 N. W. 406.

A verdict in such form as, "guilty of embezzlement as charged in the information" and fixing the amount, is valid. Guenther v. People, 24 N. Y. 100; People v. McCarthy, 110 N. Y. 309, 18 N. E. 128.

Where the verdict is guilty of some offense included in the one charged, it is a sufficient response to the charge. State v. Collyer, 17 Nev. 275, 30 Pac. 891; State v. Otey, 7 Kan. 69; Carrick v. State, 18 Ind. 409; Bryant v. State, 72 Ind. 400; Doolittle v. State, 93 Ind. 272; Birdwell v. State, — Tex. Crim. Rep. —, 20 S. W. 556; Wallace v. State, 2 Lea, 29; State v. Wilson, 40 La. Ann. 751, 1 L.R.A. 795, 5 So. 52; Revel v. State, 26 Ga. 275; People v. Davidson, 5 Cal. 133; People v. Jochinsky, 106 Cal. 638, 39 Pac. 1077.

A general verdict of "guilty" is sufficient; it implies proof of all facts necessary to a conviction. People v. Brady, 6 Cal. Unrep. 719, 65 Pac. 823.

Two or more of the acts constituting an offense may be committed by the same person at the same time and place, and the transaction be and remain one distinct offense. State v. Dale, 8 Or. 229; Bishop, Crim. Proc. § 586; State v. King, 81 Iowa, 587, 47 N. W. 775; Mills v. State, 53 Neb. 263, 73 N. W. 761; State v. Spaulding, 24 Kan. 1; Bartley v. State, 53 Neb. 310, 73 N. W. 744; State v. Mitton, 37 Mont. 366, 127 Am. St. Rep. 732, 96 Pac. 927; Territory v. Poulier, 8 Mont. 146, 19 Pac. 594; State v. Schweiter, 27 Kan. 499; Byrne v. State, 12 Wis. 519; People v. Frank, 28 Cal. 507; State v. Burns, 44 Conn. 149; Fahnestock v. State, 102 Ind. 156, 1 N. E. 372; State

v. Meade, 56 Kan. 690, 44 Pac. 619; State v. Palmer, 4 Mo. 453; Lancaster v. State, 43 Tex. 519; 1 Bishop, Crim. Proc. 2d ed. § 457; 12 Cyc. 693, 694.

The verdict is for an offense included in that charged in the information; a jury has the unquestioned right to convict for a lesser included offense. People v. Jefferson, 52 Cal. 452; People v. Barnhart, 59 Cal. 381; People v. Maroney, 109 Cal. 277, 41 Pac. 1097; People v. Lowen, 109 Cal. 381, 42 Pac. 32; People v. Muhlner, 115 Cal. 303, 47 Pac. 128 and cases cited; Phillips v. Territory, 1 Wyo. 82.

The amount of the embezzlement, under the law, is immaterial. Hoge v. People, 117 Ill. 33, 6 N. E. 796.

Omission to state the amount embezzled in the verdict is no ground for a new trial. Jones v. State, 13 Ala. 153; People v. Bork, 31 Hun, 360, 96 N. Y. 188.

A finding of the amount is for the benefit of the party whose funds have been taken. It is also the basis for a judgment. Case v. State, 26 Ala. 24; People v. Bork, supra.

No description of the embezzled funds is necessary, other than the general terms "money," "bank notes," "certificates of stock," or "valuable securities." Rev. Codes 1905, § 9864; Brown v. State, 18 Ohio St. 496; Ker v. People, 110 Ill. 646, 51 Am. Rep. 706, 4 Am. Crim. Rep. 211; State v. Reinhart, 26 Or. 466, 38 Pac. 826; Jackson v. State, 76 Ga. 573; State v. Pratt, 98 Mo. 482, 11 S. W. 978; Carl v. State, 125 Ala. 89, 28 So. 505; Willis v. State, 134 Ala. 429, 33 So. 226; State v. Wise, 186 Mo. 42, 84 S. W. 954; State v. Wissing, 187 Mo. 96, 85 S. W. 557; State v. Shour, 196 Mo. 202, 95 S. W. 405; Bartley v. State, 55 Neb. 294, 75 N. W. 832.

The exact amount embezzled need not be alleged or proved. The aggregate shortage may be more or less than the sum stated in the information. State v. Lewis, 31 Wash. 75, 71 Pac. 779, 782, 783; Weimer v. People, 186 Ill. 503, 58 N. E. 378, 380; Bolln v. State, 51 Neb. 581, 71 N. W. 444.

The points sought to be made by defendant in his requests for instructions were fully covered by the court in its general instructions to the jury, and were therefore properly refused by the court. State v.

Moeller, 20 N. D. 123, 126 N. W. 568; State v. Barnes, 26 S. D. 268, 128 N. W. 170.

The defendant had no proprietory right in the matter of the order of proof. Such matter is discretionary with the trial court. Bowman v. Eppinger, 1 N. D. 22, 44 N. W. 1000; State v. Ekanger, 8 N. D. 562, 80 N. W. 482; F. A. Patrick & Co. v. Austin, 20 N. D. 261, 127 N. W. 109; Pease v. Magill, 17 N. D. 166, 115 N. W. 260; State v. Albertson, 20 N. D. 516, 128 N. W. 1122; State v. Malmberg, 14 N. D. 523, 105 N. W. 614.

BRUCE, J. (after stating the facts as above). The first assignment of error, or point one, of appellant's brief, is directed to the action of the court in overruling the demurrer to the information. It is alleged that more than one offense is charged, and that the information therefor violates § 9851, Rev. Codes 1905. The information begins by informing the court "that heretofore, to wit, on the 3d day of January, 1911, in the county of Burleigh, and state of North Dakota, one George L. Bickford, late of said county and state, *did commit the crime of embezzlement in the manner following, that is to say:* Count one: That at said time and place the defendant, George L. Bickford, was, and ever since on or about the 4th day of January in the year nineteen hundred nine, had continuously been, the duly elected, qualified, and acting state's treasurer of the state of North Dakota, and during such period and in his said term of office as such state treasurer of the state of North Dakota, and by virtue of and in the course of his official duty as such state treasurer, he, said George L. Bickford, collected, received, obtained, and had in his possession and custody and under his control as such state treasurer certain public money, bank notes, checks, drafts, bills of exchange, and valuable securities of the aggregate sum and value of sixty thousand four hundred thirty-eight dollars and eleven cents, and all of which said money, bank notes, checks, drafts, bills of exchange, and valuable securities were then and there the property of the state of North Dakota; and he, the said George L. Bickford, so having in his custody and under his control as such state treasurer, as aforesaid, the public money, bank notes, checks, drafts, bills of exchange, and valuable securities aforesaid, on, to wit, the third day of January,

in the year one thousand nine hundred eleven, in the county of Burleigh in the state of North Dakota, did then and there wilfully, fraudulently, and feloniously *appropriate and convert* the same public money, bank notes, checks, drafts, bills of exchange, and valuable securities *to his own use,* in violation of his said official trust, and thereby did embezzle the same. This contrary to the statute in such cases made and provided, and against the peace and dignity of the state of North Dakota."

Count two begins with the words: "And your informant in the name and by the authority of the state of North Dakota further informs this court: That on, to wit, the third day of January, 1911, in the county of Burleigh, state of North Dakota, the said defendant, *George L. Bickford, did commit the crime of embezzlement in the manner following, that is to say:"* Then follows language identical with that of the first count, with the exception that, instead of charging that the said Bickford appropriated and converted the public money, bank notes, checks, etc., "to his own use, in violation of his said official trust, and thereby did embezzle the same,"· it charges that he appropriated and converted the said moneys, etc., "to the use of the First State Bank of Bowbells," etc., "and thereby did then and there feloniously embezzle the said public money, bank notes," etc.

The third count is the same as the foregoing, except that it charges that the said Bickford did *"loan the said public money,"* etc., "to the First State Bank of Bowbells," etc., "and then and there did feloniously embezzle the said public money," etc.

We are of the opinion that only one offense is charged. It is true that each count is complete in itself. It is, however, also true that the information begins with the general charge of the crime of embezzlement, which it says was committed "in the manner following, that is to say," and that then the separate counts follow. It is quite clear to us that this general allegation charges the one general crime of embezzlement, and that the several counts are merely various statements of the ways in which the said general crime was committed.

Sec. 9204, Rev. Codes 1905, defines embezzlement as "the fraudulent appropriation of property by a person to whom it has been intrusted." Sec. 9205 provides: "If any county treasurer or other officer or

person charged with the collection, receipt, safe keeping, transfer, or disbursement of public moneys, or securities, or any part thereof belonging to the state or any county, precinct, district, city, town, or school district shall convert to his own use, or to the use of any other person or persons, body corporate, association, or party whatever, in any way whatever, such public moneys or securities, or any portion thereof, or shall use the same or any portion thereof by way of investment in any kind of securities, stocks, loans, property, land, and merchandise, or in any form whatever not authorized by law, or shall loan the same or any portion thereof with or without interest to any company or corporation, association or individual, or if any person shall advise, aid, or in any manner knowingly participate in such act, every such act shall be deemed and held in law to be an embezzlement of so much of said moneys or securities as aforesaid as shall be thus converted, used, invested, loaned, or paid out as aforesaid, and upon conviction thereof, such county treasurer or other officer or person shall be punished by imprisonment in the penitentiary for a term of not less than one year, nor more than twenty-one years, according to the magnitude of the embezzlement, and also pay a fine equal to double the amount of money or other property so embezzled as aforesaid; which fine shall operate as a judgment at law on all the estate of the party so convicted and sentenced, and shall be enforced by execution or other process for the use of the state, county, precinct, district, town, city, or school district whose moneys or securities have been so embezzled." In the same chapter (chapter 51) are other provisions making a common offense of embezzlement out of fraudulent appropriations by carriers, trustees, bailees, and clerks or servants. It is true that in § 9205 a special penalty is provided for in case of fraudulent appropriations by public officers, but in the whole chapter there is but one common crime of embezzlement, based upon the fundamental act of the "fraudulent appropriation of property by a person to whom it has been intrusted," and in § 9205 we find no suggestion of specific crimes, but the general crime of embezzlement committed by the fraudulent misappropriation of public money by conversion to one's own use, to the use of any other person or persons, body corporate, association or party whatever, *in any way whatever*, or the use of such money, etc., in any form whatever

not authorized by law. The several counts of the information, in our opinion, do not charge, therefore, the commission of different offenses, but contain merely allegations of various ways by which the same was accomplished; or, to put it in different words, various facts by which the common and necessary fact, that is to say, the substantive crime of embezzlement, was committed. A fraudulent conversion, indeed, is at the foundation of the whole matter and of the whole chapter and of § 9205. Sec. 9205, in fact, denounces and emphasizes as embezzlement: (1) Conversion to the officer's own use; (2) conversion to the use of any other person or persons, body corporate, association, or party whatever; (3) conversion by using the same, or any portion thereof, by way of investment in any kind of securities, etc., not authorized by law; (4) conversion by using the same in any form whatever not authorized by law; (5) conversion by unlawfully loaning the same with or without interest, etc. And the foundation of all of these different unlawful appropriations is a conversion of the funds in violation of his official trust by the officer, that is to say, a fraudulent appropriation to his own use. In every case there must necessarily be the prior fraudulent appropriation to one's own use. If, indeed, an officer gives funds to one who is not entitled to receive them, or loans them to one who is not entitled to receive them, he first appropriates them from the lawful channels, exercises an individual control and use over them, and commits the basic offense of a fraudulent appropriation. Sec. 9205, indeed, would mean just the same and would be just as effective if it had simply declared that a public officer who fraudulently converts the public funds intrusted to him shall be guilty of embezzlement and punished as in said section prescribed. Here the gist of the offense is the unlawful appropriation, and the manner of its commission is subsidiary thereto. In the case of Taylor v. People, 12 Hun, 212, the court, in passing upon the sufficiency of an indictment for larceny, said: "Each count in the indictment theoretically describes a different offense, but where it is apparent 'from the general tenor of the indictment that each count relates to the same transaction,' and that the introduction of separate counts is not for the purpose of proving distinct offenses, but only for the purpose of meeting possible variances or defects of the evidence to establish some one of the ingredients of the

felony as described in a particular count, then the court can properly exercise a discretion to prevent a failure of justice, and treat the indictment as it is in fact an indictment for one offense." See also State v. Chapman, 6 Nev. 320; People v. Rice, 35 N. Y. S. R. 185, 13 N. Y. Supp. 161; People v. Rose, 52 Hun, 33, 4 N. Y. Supp. 787. In State v. Malim, 14 Nev. 288, the court said: "Is it not evident from the general frame-work, language and structure of the indictment in the present case, that the same offense was intended to be and is charged in each count? If so, that is all the law requires." In the case of People v. Rose, 39 N. Y. S. R. 291, 15 N. Y. Supp. 815, the court said: "The fair inference arising from these allegations shows that the offenses alleged related to one and the same transaction, and were intended to charge but one offense; that the pleader, to meet any variance of proof, has made the allegations to that end." In Bishop's Criminal Procedure, 2d ed. § 457, we find the following: "The general rule in felony is that the court will permit the prosecution to give evidence of only one felonious transaction, but when it appears, on the opening of the case and during the trial, that there is no more than one criminal prosecution involved, and the joinder of the different counts is meant only to meet the various aspects in which the evidence may present itself, the court will not restrict the prosecuting officer to particular counts, and will suffer a general verdict taken on the whole." See also M'Gregg v. State, 4 Blackf. 101; Kane v. People, 8 Wend. 203; McCollough v. State, 132 Ind. 427, 31 N. E. 1116; Mills v. State, 53 Neb. 263, 75 N. W. 761; State v. Mitton, 37 Mont. 366, 127 Am. St. Rep. 732, 96 Pac. 927.

The same considerations and conclusions apply to the second point, that the verdict does not find the defendant guilty or not guilty, and is indefinite because of the three counts. The verdict was "guilty of embezzlement as charged in the information." As we have before said, there was but one offense charged, and that was embezzlement; embezzlement, it is true, by a public officer, but every count contained this allegation. In the case of Mills v. State, 53 Neb. 263, 73 N. W. 761, the statute was identical with § 9205, Rev. Codes 1905. The information was in four counts, and the trial was on two of them; the one alleging embezzlement of $6,000 by conversion to the embezzler's

own use, and the other alleging embezzlement by loaning and convert-
ing $6,000 to the use of the defendant, who was charged in both counts
as an abettor to the officer. The defendant attacked the proceeding,
and claimed that one of the counts charged a different offense from
that on which there had been a preliminary hearing. The court, on
page 763, said: "In the case at bar the fourth count of the information
charged the embezzlement of the same money, of the same party, and
at the same time, as did the complaint; the sole difference being the
manner or method alleged of the commission of the crime. It was not
a charge of a different offense; the allegation of the manner in which
the crime was committed was varied,— no doubt, to meet a possible
contingency in the evidence. This was allowable." In the case of State
v. Mitton, supra, there was a prosecution in two counts for forgery;
one for forgery proper, and one for uttering the forged instrument, both
acts being defined in the same statute as the crime of forgery. There
was a demurrer for duplicity. The court said: "Where the statute
declares an act unlawful when perpetrated in any one or all of several
modes, an indictment may charge the act in separate counts, basing
each count upon the different modes specified; and it is held that the
indictment may contain, in one count, an enumeration of all the dif-
ferent modes or means by which the crime may be committed." See also
Territory v. Poulier, 8 Mont. 146, 19 Pac. 594. In 1 Bishop on Crim-
inal Procedure, § 457, we find the following: "When it appears  . . .
that there is no more than one criminal transaction involved, and the
joinder of the different counts is meant only to meet the various aspects
in which the evidence may present itself, the court will not restrict the
prosecuting officer on particular counts, and will suffer a general verdict
to be taken on the whole." In 12 Cyc. 693, we find: "When but one
offense is charged in various forms in separate counts of one indictment,
a general verdict of guilty, or of guilty as charged, without mentioning
the count on which it is based, is sufficient." See also 12 Cyc. 693,
note 25.

Counsel for appellant seems to admit that a plain verdict of guilty
would have been sufficient, but claims that the verdict of "guilty of em-
bezzlement as charged in the information" was a nullity. He also,
in the same breath, claims that the jury should have specifically found
that the defendant was a public officer, etc. Sec. 10044, Rev. Codes

28 N. D.—5.

1905, provides that "a general verdict upon a plea of not guilty is either 'guilty' or 'not guilty,' which imports a conviction or acquittal of the offense charged in the information or indictment." The verdict before us was a general verdict under the statute, with the addition of the words "as charged in the indictment." If the jury had found the defendant guilty merely, that would have imported a conviction of the offense charged in the information. We are asked to hold that the addition of the very words which the law would presume from the use of the word "guilty" alone renders the verdict invalid. The contention needs merely to be stated in order to be refuted. The word "guilty" alone would have found him guilty of all of the elements of the crime charged, including the fact of being a state officer. That fact cannot be obviated by the additional fact that the jury also found him guilty of the crime of embezzlement with which the information charged him.

It is also claimed that the state voluntarily selected the draft of May 15th, 1909, for $25,215.26, as the subject of the embezzlement charged in the information, and that the state thus voluntarily elected to ask conviction upon this item alone. It is claimed that no attempt was made to establish the embezzlement by showing that the books called for the production of $60,438.11 more than the cash on hand; that no demand was made upon the defendant for $60,438.11, or any other sum more than the payment of the certificates; and that the following objection should have been sustained: "Defendant objects to the introduction of any evidence tending to establish an embezzlement, or claimed to tend to establish an embezzlement, other than the $25,215.26 item that has been isolated and set apart by the testimony of the witnesses of the state at the present time, it now appearing that this remittance was made at one particular time and was separate and distinct from all other remittances, and that there was no additional remittance made by Mr. Halvorson, the county treasurer, until at least thirty days there-after, for his testimony shows that the remittances were made not more often than monthly, and until there is some showing to the court that there is an intent to aggregate several payments to the embezzlement of a gross sum, the state should be limited to the particular transaction which by its own volition it has selected as being the subject of the charge contained in the information; the defense insisting that by

isolating the $25,000 transaction the state has voluntarily made an election which is just as binding upon the state as though such election and selection had been made in pursuance to an order of the court. That evidence as to all other transactions is incompetent, irrelevant, and immaterial to prove the embezzlement of the $25,000 item, and an attempt to establish a chain of crimes other than that, the one so isolated and selected by the state as the subject of the information and upon which the defendant is upon trial. . . . I will make that a little more specific. This relates to an offense other than and distinct from the offense already isolated and selected by the state as the basis of the prosecution; that by the selection of the $25,000 incident, being draft No. 9648, the state has voluntarily made its selection, which is binding upon it; and evidence of other transactions is entirely irrelevant and immaterial to the issues thus voluntarily made upon the No. 9648 draft transaction. It is not in the nature of a continuing offense in any way. They have voluntarily selected one particular incident as being the subject of embezzlement that they have sought to prove under the information. The information does not bind them either as to time or as to amount, but having made the selection it is entirely incompetent to show other similar transactions, or other separate and distinct and isolated transactions, for the purpose of cumulating them with the one thus voluntarily selected in order to make up the aggregate charged in the information." There is no merit in this objection, nor in the accompanying one that the state should have been required to elect between the three counts of the information, and that at any rate the prosecution should have been confined in its proof to the first item of $25,215.26, which was the amount of the first remittance from Barnes county. What the state was developing in its proof was not an isolated embezzlement, but a long-drawn out and intricate scheme. This, under its general charge in the information, it was entitled to do. The reasons for the rule are clearly set forth by the supreme court of Illinois in Ker v. People, 110 Ill. 627, 647, 51 Am. Rep. 706, 4 Am. Crim. Rep. 211, when in its opinion it says: "It is insisted the evidence shows a cumulation of offenses, and for that reason it was error in the court to deny defendant's motion to compel the prosecution to elect upon what alleged act of larceny or embezzlement a conviction would

be asked. The court, by its ruling, submitted all the evidence touching the embezzlement of funds and securities by defendant, to the jury, and it is not perceived how it could properly have done otherwise. Embezzlement is a crime defined by statute, and it was entirely competent for the legislature to declare what acts would constitute the crime, and fix the measure of punishment. One element that enters into the statutory definition of embezzlement is the fiduciary or confidential relation. Such relations afford the amplest opportunity to misappropriate money, funds, and securities, and often present great difficulty in proving exactly when and how it was done. This is especially true with regard to clerks and confidential agents in banks, or other corporations or firms doing a large business, and who are intrusted, in whole or in part, with the care or custody of funds, securities, and property belonging to banks or other corporations, or to a copartnership. It is difficult, in such cases, if at all possible, to prove with certainty when or how the embezzlement was affected. It is, of course, done with a view to avoid detection, and the confidential relations existing ward off suspicion. Embezzlement may, and most often does, consist of many acts done in a series of years, and the fact at last disclosed, that the employer's money and funds are embezzled, is the crime against which the statute is leveled. In such cases, should the prosecution be compelled to elect it would claim a conviction for only one of the many acts of the series that constitute the *corpus delicti,* it would be doubtful if a conviction could be had, under §§ 75 and 76 of the Criminal Code, against a clerk in a bank or other corporation, or a copartnership, although the accused might be conceded to be guilty of embezzling large sums of money in the aggregate. * * * Under this rule, which is certainly a wise one, it was proper the court should permit all the evidence of what defendant did by reason of his confidential relations with the banking firm whose clerk he was, to go to the jury, as was done, and if the jury found, from the whole evidence, any funds or securities for money had been embezzled or fraudulently converted to his own use by defendant, it was sufficient to maintain the charge of embezzlement, as that crime is defined in the 75th and 76th sections of the Criminal Code. Any other rule would render it exceedingly difficult to secure a conviction under either of these sections of the stat-

ute. The view taken by the defense, of this statute, is too narrow and technical to be adopted. It has a broader meaning, and, when correctly read, it will embrace all wrongful conduct by confidential clerks, agents, or servants, and leave no opportunity for escape from just punishment on mere technical objections not affecting the guilt or innocence of the party accused."

The crime of embezzlement as known under the codes and in North Dakota is not the common-law offense of larceny. It is not necessary that the specific property appropriated should be identified, and that the prosecution should be based on the specific misappropriation of the aggregate sum charged. Sec. 9211 of the Revised Codes 1905, provides that "a distinct act of taking is not necessary to constitute embezzlement, but any fraudulent appropriation, conversion, or use of property, coming within the above prohibitions, is sufficient." Sec. 9864 provides: "In an information or indictment for larceny or embezzlement of money, bank notes, certificates of stock, or valuable securities, or for a conspiracy to cheat and defraud a person of any such property, it is sufficient to allege the larceny or embezzlement, or the conspiracy to cheat and defraud, to be of money, bank notes, certificates of stock, or valuable securities, without specifying the coin, number, denomination, or kind thereof." Sec. 9204 defines the crime as being "the fraudulent appropriation of property by a person to whom it has been intrusted." There can be no doubt that under the authorities and under the modern statutes, the aggregate misappropriation may be treated as one crime and all the peculations as parts of the one offense, and that the aggregate shortage proven may be more or less than the sum stated in the information. It is not necessary even that the exact sum embezzled should be alleged, and it is not necessary to prove the exact sum charged. "In the case at bar," says the supreme court of Massachusetts, in Com. v. Hussey, 111 Mass. 432, 434, "the evidence that proved the embezzlement proved that the amount and value of the notes embezzled was $70, and not $65. And it is insisted on the part of the defendant that, as the indictment alleges an excuse for not giving a more specific description of the notes, the amount and value are made a part of the description of the offense and essential to its identity, in the same manner as an unnecessary averment as to the

color of a horse alleged to have been stolen becomes a matter of description which must be proved as alleged. In other words, that the grand jury have described the property merely by the amount and value, and that a variance in that respect entitles the defendant to an acquittal. But this objection is in our judgment untenable. The two cases above cited [Com. v. Sawtelle, 11 Cush. 142, and Com. v. Duffy, 11 Cush. 145] make it certain that where the crime is described as it is in this indictment, it is not a material variance to prove the larceny of less than the alleged amount and value. The number stated may be much larger than appears in proof, and yet furnish no ground of objection on account of variance. The amount and value in this indictment do not appear to us to be descriptive of the offense, in such a manner as to fix its identity. The property is described as 'divers promissory notes, payable to bearer, current as money in this commonwealth.' No attempt is made to give the number or denominations of the notes, but it was necessary to state that they had a value, in order that they should be subjects of larceny; and in the case of notes current as money, the amount and value would ordinarily be synonymous terms. Except on the ground of variance, the defendant cannot object that less is charged against him than was proved. If proof of less than the amount and value charged is not a variance, it is difficult to see why proof of more should be. If the indictment had contained a more particular description, the proof must have been limited accordingly. But it was not necessary to give a more particular description, for that given was already sufficient to support a judgment; and the allegation that a more particular description was unknown to the grand jurors was therefore an immaterial allegation, and proof that a more particular description was in fact known to them did not create a fatal variance between the indictment and the proof." And to the same effect are 7 Enc. Pl. & Pr. 454; 15 Cyc. 526; United States v. Fish, 24 Fed. 585; State v. Ring, 29 Minn. 78, 11 N. W. 233; State v. Lewis, 31 Wash. 75, 71 Pac. 778, 782, 783; and see also Weimer v. People, 186 Ill. 503, 58 N. E. 378, 379; Bolln v. State, 51 Neb. 581, 71 N. W. 444; Brown v. State, 18 Ohio St. 496; Ker v. People, 110 Ill. 646, 51 Am. Rep. 706, 4 Am. Crim. Rep. 211; State v. Reinhart, 26 Or. 466, 38 Pac. 822, 826, 827; Jackson v. State, 76 Ga. 573; State v. Pratt, 98 Mo. 482, 11

S. W. 978; Carl v. State, 125 Ala. 89, 28 So. 505; Willis v. State, 134 Ala. 429, 33 So. 226; State v. Wise, 186 Mo. 42, 84 S. W. 954; State v. Wissing, 187 Mo. 96, 85 S. W. 557; State v. Shour, 196 Mo. 202, 95 S. W. 405; Bartley v. State, 55 Neb. 294, 75 N. W. 832; Morse v. Com. 129 Ky. 294, 111 S. W. 714; State v. Moyer, 58 W. Va. 146, 52 S. E. 30, 6 Ann. Cas. 344. There can be little doubt, indeed, that the defendant during his term of office embezzled a much larger sum than the amount found by the jury. In our opinion, also, the mere fact that there may have been in the cash drawer at the time that the defendant relinquished his office more than sufficient to equal the $54.-65 in no way atones for or expunges the crime. The crime of embezzlement by a public officer does not consist in failing to turn over all moneys due to the state at the time of the relinquishment of office, but in having fraudulently converted money or securities while in that office. The mere fact that a friend may come to one's rescue, and furnish money sufficient to make good a shortage on the final accounting, does not in any way negative the fact that prior to such final accounting money had been fraudulently converted, that is to say, embezzled. The above consideration and conclusion also apply to the claim that the verdict is a nullity because in it an embezzlement of $54.65 is found to have been committed, when the amount charged in the information is $60,438.11, as well as the point that there is no proof that the $54.-65 item was ever paid or loaned to the Bowbells bank. We merely desire to add that no matter what may be the case with the second and third counts, the first count says nothing about the Bowbells bank, and contents itself with merely charging the embezzlement of an aggregate sum. It does not specify or itemize the items, nor does it make the sum charged a necessary description of the offense. That proof of the embezzlement of a greater or less sum than that charged is admissible under such a count is well established in the authorities. See Com. v. Hussey, 111 Mass. 432, 434, and cases just above cited.

We next come to the defense that the state depository banks were already filled to their limit with state funds at the time of the defendant's taking office, and that something had to be done with the money in his possession. It is claimed that even though the defendant may not have had the right to make general deposits to these banks, he had

the right to make special deposits for the safe keeping of the money and that in any event a mere deposit in a bank is not a loan to such bank or a violation of the statute which makes it an offense to "use the same, or any portion thereof, by way of investment in any kind of securities, stocks, loans, property, land, and merchandise, or in any form whatever not authorized by law, or shall loan the same, or any portion thereof, with or without interest, to any company or corporation, association or individual." It is argued with great force, and in spite of its economic falsity the proposition no doubt finds support in many authorities, that a deposit of money in a bank does not constitute a loaning to or conversion thereof to the use of the bank. Whether true or not, however, as a general proposition, the intention is after all controlling. The real question was, did the defendant really loan the money as a special deposit, or did he intend that the bank, in which he was heavily interested, should have the use and benefit thereof. If merely a special deposit, and not a loan or intended for a loan, why did the defendant so sedulously keep the fact from the various bank examiners and from the public at large, and why did he make fictitious entries and fictitious deposits and withdrawals in other banks in order to cover up the matter? It is idle to claim that the deposit in the Bowbells bank was a special deposit. A special deposit is a bailment of certain specified property which can and is to be identified and returned. There was no pretense even of any such thing in the case at bar. It would appear that on these matters the trial court thoroughly and correctly instructed the jury. He, among other things, said: "You are instructed that the state treasurer has the right to deposit moneys in the bank designated by the state board of auditors as a depository, and it is not necessary that such deposit shall be upon open account. It is sufficient if such deposit is subject to payment on demand, and before you can find a verdict of guilty against the defendant for the embezzlement of any funds so deposited you must be satisfied beyond a reasonable doubt that the defendant deposited such moneys with the intent, at the time of so depositing the same, to fraudulently convert same to his own use and benefit, or to the use and benefit of such bank. I charge you as a matter of law that the defendant had the right during the year of 1910 to deposit funds, either by way

of special deposit or for safe keeping, in the State Bank of Bowbells; and if such deposit was not made with a fraudulent intent to deprive the state of the use of such moneys, and with specific fraudulent intent to convert the same to his own use or to the use of such bank, then such deposit would not be illegal, and you must find the defendant not guilty. The law of this state permits the state treasurer to deposit the public moneys in his control in only two forms: First, a deposit; second, a special deposit. A general deposit in a bank is the ordinary form of bank deposit, where the banker is entitled to mingle the money deposited with the other funds of the bank, and use it in the ordinary course of business. A general deposit of state money by the state treasurer can be lawfully made only in those banks which have been designated by the state board of auditors and have qualified as state depositories, and such general deposits cannot rightfully exceed the maximum amount for which the depository bank has qualified as such. *A special deposit of money by the state treasurer in a bank is a placing of the money in the bank merely for safe keeping, so that the banker is a mere bailee, and must keep the identical money without mingling it with the other funds of the bank, to be returned in kind to the state treasurer, or such person or persons as he may direct.* A special deposit, as before defined, may be made in any bank, but the banker holding such special deposit cannot lawfully use the money so specially deposited." It appears to us that these instructions correctly state the law. Under the statute all that the defendant could legally do was to make a special deposit of the excess funds. The statutes in regard to the state depositories otherwise would be meaningless, and so would the section of the Penal Code under which the defendant was prosecuted. If deposits in excess of the amount allowed can be made in banks at the will of the treasurer, and loaned out by those banks at will, all of the security aimed at by the law is taken away.

"Deposits made with bankers," says the supreme court of Alabama, "are either general or special. In the case of a special deposit the bank merely assumes the charge or custody of property, without authority to use it, and the depositor is entitled to receive back the identical money or thing deposited. In such case the right of property re-

mains in the depositor, and, if the deposit is of money, the bank may not mingle it with its own funds. The relation created is that of bailor and bailee, and not that of creditor and debtor." Alston v. State, 92 Ala. 124, 13 L.R.A. 659, 9 So. 732. See also 7 Words & Phrases, p. 6574. Koetting v. State, 88 Wis. 502, 60 N. W. 822, 823; Bank of Blackwell v. Dean, 9 Okla. 626, 60 Pac. 226; Officer v. Officer, 120 Iowa, 389, 98 Am. St. Rep. 365, 94 N. W. 947, 948; Catlin v. Savings Bank, 7 Conn. 487, 492; Ruffin v. Orange County, 69 N. C. 498, 509; Talladega Ins. Co. v. Landers, 43 Ala. 115, 138; Collins v. State, 33 Fla. 429, 15 So. 214, 217; Keene v. Collier, 1 Met. (Ky.) 415, 417; State v. Carson City Sav. Bank, 17 Nev. 146, 30 Pac. 703, 704; McLain v. Wallace, 103 Ind. 562, 5 N. E. 911, 912; Wright v. Pain, 62 Ala. 340, 343, 34 Am. Rep. 24; First Nat. Bank v. Graham, 100 U. S. 699, 703, 25 L. ed. 750, 751; Pattison v. Syracuse Nat. Bank, 80 N. Y. 82, 90, 36 Am. Rep. 582; National Bank v. Speight, 47 N. Y. 668; Marine Bank v. Fulton County Bank, 2 Wall. 252, 256, 17 L. ed. 785, 787; Mutual Acci. Asso. v. Jacobs, 141 Ill. 261, 16 L.R.A. 516, 33 Am. St. Rep. 302, 31 N. E. 414, 416 (citing Anderson's Law Dict. 344). The deposits, then, in the case at bar, were not special deposits, and the statute was to that extent violated. The money was put to a use that was not permitted by the law. Paragraph 14 of § 111, Rev. Codes 1905, describes as one of the duties of the state treasurer the duty "to keep all moneys belonging to the state *in his own possession until disbursed according to law,"* but nothing in the subdivision prohibits him from making *special deposits for the safe-keeping of public moneys.* Sec. 232 provides: "All funds of the state shall be deposited by the treasurer in one or more designated state or national banks in the state of North Dakota on or before the first day of each month, in the name of this state. Such bank or banks shall be designated by the board of auditors in conjunction with the governor; . . . provided that the amount deposited in any bank shall not exceed 50 per cent of its paid-up capital and surplus." Sec. 9205 makes it embezzlement for a public officer "to convert to his own use, or to the use of any other person or persons, body corporate, association, or party whatever, in any way whatever, such public moneys or securities, or any portion thereof, by way of investment in

any kind of securities, stocks, loans, property, land, and merchandise, *or in any form whatever not authorized by law,* or shall loan the same, or any portion thereof, with or without interest, to any company or corporation, association or individual." It would seem that a general deposit of $60,000 in excess of the legal limit of a depository bank, coupled with a sedulous system of concealment, would sufficiently indicate an intention to violate, and a violation of, the statute in question. The crime of embezzlement, indeed, may be committed by a fraudulent failure to account for funds, as well as by their physical confiscation. Champion Ice Mfg. & Cold Storage Co. v. American Bonding & T. Co. 115 Ky. 863, 103 Am. St. Rep. 356, 75 S. W. 197, 198. Where, therefore, prior to and in the various examinations of the state bank examiners and the general reports that were required by law to be made to the governor, the defendant kept concealed in his private cash drawer the various certificates of deposit, some of which at any rate were made payable to no particular party, as well as the receipt from the Bowbells State Bank, and concealed the making of such deposits and his dealings in relation to the Barnes county remittance by means of fraudulent entries, he to all intents and purposes, and in the eye of the law, embezzled the money, and the jury was justified in so holding. The same is true of the $54.65. He made no record of its receipt. He obtained it as part of a fraudulent transaction, and the jury was perfectly justified in holding that it had been embezzled. These facts, at any rate, the state's evidence tended to show, and the conclusion to be drawn therefrom was for the jury and not the court, to make.

There is much to be said in support of the proposition that the mere making of a general deposit in excess of the amount allowed by the statute in itself constituted an embezzlement. This, however, it is not necessary to decide. The trial judge did not instruct the jury that it did. He, it is true, charged the jury that no sum above the prescribed amount could be legally deposited, but at the same time he charged them that "the state treasurer has the right to deposit moneys in the bank designated by the state board of auditors as a depository, and it is not necessary that such deposit shall be upon open account. It is sufficient if such deposit is subject to payment upon demand; and

before you can find a verdict of guilty against the defendant for the embezzlement of any money so deposited, you must be satisfied beyond a reasonable doubt that the defendant deposited such moneys *with the intention, at the time of so depositing the same, to fraudulently convert the same to his own use and benefit, or to the use and benefit of such bank.*" It is quite clear that the defendant desired, and during his term of office succeeded in concealing the fact of these excess deposits in the Bowbells bank. Unless he thought the act in itself criminal, the only other motive for such concealment could have been the fear lest the board of auditors and state bank examiners would, if it were known, order the withdrawal of the funds and thus deprive the bank of their use. This is a motive, indeed, which is apparent throughout all of the evidence and throughout all of the shifting of accounts. If the desire to preserve this use in the bank was the reason of these concealments, and this use was unlawful, even though not necessarily criminal, then there was an embezzlement committed on the occasion of each and every concealment, and the reason for such concealments was for the jury to determine.

These considerations practically dispose of all of the criticisms as to the instructions given and refused. We find that the jury was correctly and fully and fairly instructed as to the law of the case, and that the instructions refused were either fully covered, or were not in conformity to the law as applied to the facts in evidence. We find no prejudice to the defendant in the refusal of any of them, or in the rulings of the trial court generally.

The jury was, in our opinion, fully justified in finding that at any rate the amount of $54.65 had been embezzled. The $5,000 certificate of deposit was cashed in order to raise the sum of $1,900 to effect the substitution of funds in connection with the fictitious deposit of $23,—215.26 in the Union National Bank of Grand Forks, which was, as we construe the evidence and as the jury had the right to believe, itself made to cover up a previous false entry in the account of the First National Bank of Fargo, which in turn had, as we believe, and as the jury also had the right to believe, also been made to conceal previous misappropriations. The $5,000 certificate even had, for some reason which was unexplained upon the trial, been taken, not in the

name of the state or of the state treasurer, but in that of one Bertle Nelson, though it admittedly represented state funds. When the defendant desired the same cashed he wrote the following personal letter to the President of the Flaxton Bank:

Friend Burgett:

Enclosed please find C. D. No. 505, for $5,000. Please place $1,900 of this to the credit of the state and send me draft for the balance, $3,100. Also please *send me separate draft for $50,* the amount of interest due on same.

The defendant himself testified that he did not know that it was ever credited to the state, and the witness Mrs. Mitchell testified that it was not. The jury found that it was not, and was embezzled, and we can hardly set aside their verdict. The mere fact that when the defendant gave up his office in January, 1912, and after the refusal of his successor to accept the Bowbells certificates of deposit, there was a surplus of $150 in the cash drawer, and which he afterwards withdrew without saying anything about the $54.65 item, cannot be considered proof in any sense that he had not before embezzled it. The matter, at any rate, was one for the jury to pass upon.

There is no merit in the contention that the testimony as to the fact that the $54.65 item was not entered upon the books was elicited in rebuttal. The order of proof is largely within the control of the trial court, and his discretion must largely control. Bowman v. Eppinger, 1 N. D. 22, 44 N. W. 1000; State v. Ekanger, 8 N. D. 559, 80 N. W. 482; State v. Albertson, 20 N. D. 512, 516, 128 N. W. 1122; F. A. Patrick & Co. v. Austin, 20 N. D. 261, 127 N. W. 109; Pease v. Magill, 17 N. D. 166, 115 N. W. 260. The defendant had before admitted that he had received the amount, and it is to us quite conclusively shown that he received it in the course of a series of fraudulent transactions. The evidence was competent not merely to show the embezzlement of the particular item, but a general criminal intent throughout the entire transactions. On cross-examination he stated that he did not know whether it had been accounted for or not. At the end of the trial and on rebuttal the witness Mrs. Mitchell testi-

fied that the item had not been credited to the state. The only objection made to her testimony was that the testimony was "not the best evidence, incompetent as such, irrelevant, and immaterial." The witness was the bookkeeper, and had given much testimony in relation to the state of the books. There was no objection made that such a question was not proper on rebuttal, and the point here made does not seem to have been specifically raised on the trial. The defendant could, however, have been recalled, and proof introduced to show that it had been credited, if that was the fact. We think that the allowance of the question and answer was fully within the discretion of the trial judge, and that the objection made upon the trial was not specific enough in its form to raise the point here made, or to justify a review thereof. See Thomp. Trials, 2d ed. §§ 693, 694; Goldberg v. Sisseton Loan & Title Co. 24 S. D. 49, 140 Am. St. Rep. 775, 123 N. W. 266, 271; Jones v. Angell, 95 Ind. 376; Davis v. Holy Terror Min. Co. 20 S. D. 399, 107 N. W. 374.

The case as a whole is simply this: The defendant is charged with embezzling public moneys, bank drafts, notes, bills of exchange and valuable securities of the *aggregate* value and sum of $60,438.11. There is no specification of the items in the information, though this amount equals several specific items proved on the trial. The authorities are unanimous that in an action for embezzlement the specific sum need not be alleged, and that a verdict may be sustained for an amount smaller or greater than that charged. The embezzlement of the $60,—438.11 is conclusively shown by the evidence; at least, there is evidence from which the jury might well find it. There is evidence that during the transaction the defendant kept a draft for $54.65; in other words, embezzled not merely $60,438.11, but $60,492.76. It is, however, shown that all of this money except the $54.65, and possibly the interest on some open account deposits, the amount of which is not to be found in the evidence, was returned by the defendant after an accounting had been demanded of him. The later return, however, did not in any way atone for the prior crime. Rev. Codes 1905, § 9215. The statute in such cases allows not merely a verdict of guilty, but a verdict which shall specify the amount embezzled, and make the amount a lien upon the property of the defendant, so that it may be collected

by the state. The jury found the defendant guilty as charged in the information, but merely stated the sum embezzled as $54.65, evidently thinking that, the rest of the money being returned, the lien of the judgment should only extend to that amount. As we have said, there is no specific allegation in the information of the specific sums or amounts embezzled, merely the aggregate; and that a verdict can be sustained for a greater or less amount is well established. The $54.65 item was interest upon a certificate of deposit which was itself manipulated in furtherance of the aggregate embezzlement. It bore much of the relationship of the wool on the back of a stolen sheep, which a man cuts and keeps, although he afterwards returns the shorn animal. It would be a travesty on justice to hold that the embezzlement of such a sum was not included in the general offense charged and was not a part of it.

The judgment of the District Court is affirmed.

FISK, J., dissenting. I am unable to concur in the conclusion arrived at in the majority opinion. While I do not disagree with much that is therein said by my brother Bruce, and am willing to concede that defendant, under the record facts, was guilty of the grossest irregularities, and perhaps embezzlements, in the exercise of the trust reposed in him by the people of this state, I am compelled to the view that the jury, by its verdict, in legal effect acquitted him of the crime charged in the information, and attempted to find him guilty of another and distinct offense not charged therein.

In this dissenting opinion I deem it unnecessary to consider any other point in the case, and shall merely endeavor to briefly make clear my views upon the one point above mentioned.

The verdict finds the defendant guilty of embezzling the sum of $54.65. This is the exact amount of the interest draft, Ex 105, sent to defendant at his request by the Flaxton bank, and it is entirely clear that this check constitutes the item for the embezzlement of which the jury found defendant guilty. The record unmistakably demonstrates this to be a fact. To justify the verdict, therefore, the court must be able to say that such item is embraced within the charge contained in the information, for, of course, it is elementary that a

person cannot legally be convicted of an offense of which he has not been formally accused. The inquiry, therefore, logically arises as to whether such draft is embraced within either count of the information. And this suggests the thought that, inasmuch as concededly but one offense may be charged in such information, each count thereof must necessarily relate to the same offense or criminal transaction, merely stating or alleging the same to have been committed in different forms or methods. Turning to the information, we find that defendant is charged in each count with having embezzled items aggregating the sum of $60,438.11, and turning to the evidence of the state in chief we find proof of five specific items consisting of drafts and checks aggregating that amount to the cent, and for which sum defendant, on January 3, 1911, held certificates of deposit issued by the Bowbells bank, and it is strikingly apparent that the check for $54.65 is not included therein. Manifestly, the same could not be included therein for the obvious reason that there is no pretension that such item was embezzled by depositing or loaning the same or the proceeds thereof to the Bowbells bank, and the items as charged in each count, as before stated, must be held to be the same, for otherwise separate offenses are alleged. Therefore it cannot be correctly said that count one embraces the $54.65 item. This item was not mentioned nor heard of in the state's main case, nor until near the close of the trial, and on the cross-examination of the defendant on rebuttal, when the same was accidentally disclosed. It is stated in the majority opinion that there is no merit in the appellant's contention that the testimony as to the fact that the $54.65 item was not entered upon the books was elicited in rebuttal. It is said: "The order of proof is largely within the control of the trial court and his discretion must largely control. The defendant admitted that he had received the amount, and it is quite conclusively shown that he received it in the course of a series of fraudulent transactions. On cross-examination he stated that he did not know whether it had been accounted for or not. At the end of the trial and on rebuttal, the witness Mrs. Mitchell testified that the item had not been credited to the state. The only objection made to her testimony was that the testimony was 'not the best evidence, incompetent as such, *irrelevant,* and immaterial.' . . . There was no

objection made that such a question was not proper on rebuttal, and the point here made does not seem to have been specifically raised on the trial." The majority opinion then states in conclusion that the allowance of such testimony was within the trial court's discretion, and also that the objection was not sufficiently specific in form to raise the point. This portion of the opinion must have been written on the assumption, which I think is erroneous, that the $54.65 item is embraced in the information, for otherwise it cannot be justified under any rule or decision, so far as my knowledge extends. I have no quarrel with the abstract propositions of law therein stated, but I do not think they apply in the case at bar. It requires no argument to show that a citizen ought not to be sent to the penitentiary for an offense which he has neither been charged with nor convicted of, except through the failure of his counsel to interpose technically proper objections. Even conceding his guilt of such offense, the interests of the state do not demand his conviction in such a manner. Quite the contrary is true. Courts will not ordinarily resort to technical rules in order to sustain a conviction, especially a conviction of an offense not charged. The crucial and decisive question on the point under consideration, therefore, is as to whether this item of $54.65 is included as a portion of the funds covered in the information. In answering this question we must not overlook the fact that in employing three separate counts in the information the public prosecutor did not and could not have intended to charge more than one offense or criminal transaction, and each count must be construed as alleging merely different methods of embezzling the *same* funds. These different methods might have been charged in one count, provided they were stated in the alternative. This proviso also applies where different counts are employed, but the pleader seems not to have observed this in drawing the information in question. However, this failure is not material to the point we are here discussing.

A fair test as to whether the $54.65 item is included in the information is whether a conviction or acquittal under such information could be successfully urged in bar of an attempted prosecution under another information specifically charging the embezzlement of such check. I think it could not.

28 N. D.—6.

In the majority opinion it seems to be assumed, however, that the charge in the information is a general charge, entitling the state to maintain the same by proof of the embezzlement of any items involved in any of the transactions relating to the defendant's official duties as treasurer; but I think such assumption is clearly unauthorized. If the pleader had seen fit to specify and minutely describe each of the four or five drafts and checks aggregating the sum of $60,438.11, I apprehend it could not be argued that such charge would be general, so as to authorize proof of the embezzlement of any other drafts or checks; yet the pleader just as effectually described these items aggregating $60,438.11 as though he had mentioned them in detail, for he saw fit to characterize them as having been wrongfully turned over to the Bowbells bank. This effectually excluded items not thus misappropriated, and precluded the state from proving such other items.

Had the state seen fit to charge in general terms that defendant embezzled at a certain time or during a certain period, public funds entrusted to him as state treasurer, consisting of moneys, drafts, checks, etc., aggregating a certain sum or a sum in excess of a certain designated amount, by feloniously converting the same to his own use or to the use of another, I am willing to concede that the state would have a wider latitude in proving the charge, and perhaps it might, under such general allegation, properly have proved the embezzlement of the $54.65 interest item aforesaid. But where, as in this case, the state's attorney has elected to specifically point out and identify the particular funds claimed to have been embezzled, by alleging the precise manner in which such acts of embezzlement were committed, as by appropriating and converting the same to the use of the First State Bank of Bowbells, as charged in count two; or by loaning the same to said bank, as charged in count three, I think the state should be restricted in its proof to funds thus specifically designated, and which it has elected to single out in this manner. By such election it seems to me that the state has, in legal effect as it had the right to do, excluded other funds or embezzlements from the information. I do not believe that the authorities cited and relied upon in the majority opinion, when carefully examined, will be found to hold otherwise.

The case of Ker v. People, 110 Ill. 627, 51 Am. Rep. 706, 4 Am.

Crim. 211, cited in the majority opinion, and therein quoted from at length, is, I think, plainly distinguishable from the case at bar. That portion of the quotation after the stars is somewhat misleading, because it refers not to language preceding the stars, but to a statutory rule in Illinois (§ 82 of the Criminal Code) which is held controlling.

The foregoing views, inadequately expressed, afford sufficient reasons why I think the conviction should not be upheld, and I deem it unnecessary to express any opinion upon the other questions presented.

I am authorized to state that Mr. Chief Justice SPALDING concurs in these views.

## On Rehearing.

BRUCE, J. It has been urged for the first time on the petition for a rehearing that the statute (§ 9205, Rev. Codes 1905) under which the defendant was tried and convicted is unconstitutional. The act provides that upon conviction "such officer shall be punished by imprisonment in the penitentiary for a term of not less than one year nor more than twenty-one years, according to the magnitude of the embezzlement, and also to pay a fine equal to double the amount of money or other property so embezzled as aforesaid; which fine shall operate as a judgment at law on all the estate of the party so convicted and sentenced, and shall be enforced by execution or other process for the use of the state, county, precinct, district, town, city, or school district whose moneys or securities have been so embezzled." It is contended that the provision "shall be enforced by execution or other process for the use of the state, county, precinct, district, town, city, or school district whose moneys or securities have been so embezzled" is in violation of § 154 of the Constitution of North Dakota, which provides that "the interest or income of this (land grant) fund, together with the net proceeds of all fines for violation of state laws, and all other sums which shall be provided by law, shall be faithfully used and applied each year for the use of the common schools of the state."

If the point raised were one of ordinary practice, we would not now consider it, as it should have been raised both upon the trial in

the district court and upon the original hearing upon appeal. Since, however, it is a constitutional objection and is directed to the whole proceeding, we have given it due consideration, as we believe that it can never be the policy of the law that one shall be punished under an unconstitutional act, even though the objection is not seasonably made.

It has been argued by the state that the money judgment provided for in § 9205 is in the nature of a reimbursement to the municipality which is defrauded, and that there is nothing in the Constitution which prohibits such recovery, even though in a criminal action. There is much support for this proposition to be found in the cases of Coffey v. Harlan County, 204 U. S. 659, 51 L. ed. 666, 27 Sup. Ct. Rep. 305, and Whitney v. State, 53 Neb. 287, 73 N. W. 696. In these cases (which construe statutes almost identical with the one under consideration before us) the courts hold that the fine is a part of the punishment, and that it is immaterial whether it is called a penalty or a civil judgment, or whether restitution of the money embezzled has been made, or not. There is too, in Nebraska, as here, a constitutional provision providing that fines shall be for the benefit of the school fund. See Constitution of Nebraska, article 8, § 5. "As a part of the consequences of a conviction of the crime of embezzlement of a public officer," says Mr. Justice Moody, in Coffey v. Harlan County, supra, "the law of Nebraska provides that a fine double the amount embezzled shall be inflicted, which shall operate as a judgment against the estate of the convict. It is not of the slightest importance whether this fine is called a penalty, a punishment, or a civil judgment. Whatever it is called, it comes to the convict as the result of his crime. The amount of the judgment is fixed by the amount of the embezzlement, and not by the amount remaining due on account of the embezzlement, and the only question left open to the accused is the fact and amount of the embezzlement. It is provided that the judgment shall issue for double that amount, entirely irrespective of the question whether restitution has been made in whole or in part. . . . The law itself was justified by the plenary power of the state, and neither it nor its administration in this case discloses any violation of a right secured by the Constitution of the United States."

It is to be noticed, however, that neither on the appeal to the Su-

preme Court of the United States, nor apparently in the Nebraska court itself, was the point raised that the state Constitution required the proceeds of fines to be paid into the school funds, and the only point relied on seems to have been that the fine or penalty was imposed, irrespective of whether the money embezzled had been returned or not, and was therefore hardly due process of law. Though the cases, therefore, are conclusive upon the proposition that a provision is not unconstitutional which in the case of embezzlement exacts a fine double the amount of money or property embezzled, and this whether the money or property has been returned or not, they are not conclusive upon the proposition as to whether such a statute is valid where the Constitution provides that the proceeds of fines shall be put into the school funds, and the statute requires the recovery to be for the benefit of the municipality or party injured.

Although we are of the opinion that it is within the province of the legislature to impose a fine double the amount of the money embezzled, irrespective of whether it has been returned or not, we are nevertheless of the opinion that that part of the act under consideration is invalid which provides that the money collected shall be "for the use of the state, county, precinct, district, town, city or school district whose moneys or securities have been so embezzled. Waiving the question as to whether compensation for an injured individual or municipality can be recovered as a part of the judgment in a criminal action against the offender, we are quite sure that the recovery provided for under § 9205 is in the nature of a fine, and is not to be looked upon as compensation for the party injured. In the first place the word "fine" is used; in the second place, the fine is double the amount of the embezzlement, and is irrespective of whether the money has been returned or not. In the third place the officer is under bonds, and the state, county, or municipality is abundantly protected. In the fourth place, any person aiding or abetting in the act might also be indicted and punished as a principal, and in such a contingency the state, county or municipality would recover not merely twice, but many times the amount of money embezzled, and this irrespective of whether it has been returned or not. It is clear to us, therefore, that the punishment of the offender, and not the compensation of the injured state or mu-

nicipality, was the primary purpose and intention of the act. Such being the case, the recovery was a fine. Atchison, T. & S. F. R. Co. v. State, 22 Kan. 17.

Being a fine, the clause which diverted the money from the school fund was invalid, for even if we concede with the state of Wisconsin (State v. De Lano, 80 Wis. 259, 49 N. W. 808; Contra; Ex parte McMahon, 26 Nev. 243, 66 Pac. 294; Atchison, T. & S. F. R. Co. v. State, 22 Kan. 17; School Directors v. Asheville, 137 N. C. 503, 50 S. E. 279) that the word "proceeds," which is generally used in the acts which are construed, merely applies to the balance left after the cost of collection is paid, and that, under certain reward and *qui tam* statutes, compensation to the informer or prosecuting attorney may be looked upon as a cost of collection, the rule could hardly apply where the whole recovery goes to the injured state or municipality, and irrespective of the services rendered. Dutton v. Fowler, 27 Wis. 427; School Directors v. Asheville, 137 N. C. 503, 50 S. E. 279; State v. Parkins, 67 W. Va. 385, 61 S. E. 337; Lynch v. The Economy, 27 Wis. 69.

We have, therefore, a case in which a fine is rightfully imposed, but in which the legislature, after properly defining the crime and providing a punishment therefore, has, in a subsequent clause of the act, provided for a use of the money in a manner which is forbidden by § 154 of the Constitution. The question for consideration is whether such subsequent clause invalidates the whole act.

We think that the whole provision for the fine, providing, as it does, that the money shall be for the use of the state or municipality injured, instead of the general school fund, is invalid. There is, it is true, much to be said in favor of the proposition that that part only should be nullified which provides for the diversion from the school fund after the fine has been collected, and that not only the provision for the imprisonment, but the provision for the fine, should be allowed to stand, and that all the court is required to do is to strike out the clause which provides that said fine shall be "for the use of the state, county, precinct, district, town, city, or school district whose moneys or securities have been embezzled." This, of course, would leave the fine to be collected and disbursed as the Constitution provides. See

Lynch v. The Economy, supra; Harrod v. Latham Mercantile & Commercial Co. 77 Kan. 466, 95 Pac. 1; St. Louis, I. M. & S. R. Co. v. State, 55 Ark. 200, 17 S. W. 806; Pennsylvania Co. v. State, 142 Ind. 428, 41 N. E. 437.

Although we are prepared to say and to hold, however, that the legislature would have imposed a term of imprisonment at least for the period provided for in the act, irrespective of the provision for the fine, we are not prepared to say or to hold that the fine would have been as great if the legislature had realized that the proceeds must go to the general school fund, and not to the state or municipality injured. Having this doubt, we hardly can hold the provision for the fine to be valid. That the legislature, however, would have provided for a term of imprisonment and for a term as long as that provided for, irrespective of the validity or invalidity of the provision for the fine, we have no doubt. Such being the case, and the act, after the provision for the fine is eliminated, being complete and comprehensive in itself, we sustain the act as a whole, after eliminating therefrom the provision for the fine.

The District Court is directed to modify its judgment to the extent of striking therefrom the requirement for the payment of the fine. In all other respects the judgment of the District Court is affirmed and as so modified will be sustained.

SPALDING and FISK. We concur in the above, but adhere to the dissent to the original opinion.